UNITED STATES of America

v.

CONSOLIDATED FOODS CORPORATION and Chef Pierre, Inc.

Civ. A. No. 78–1241.

United States District Court,
E. D. Pennsylvania.

May 10, 1978.

---

1. See dissent filed April 20, 1978, page 106. Also see *Perkins v. Matthews*, 400 U.S. 379, 383, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971).

Walter L. Devany, John J. Hughes, James A. Backstrom, Jr., Raymond D. Cauley, Jr., Norma B. Carter, R. J. Scott Griffith, Antitrust Div., Philadelphia, Pa., for plaintiff.

Louis C. Keiler, Earl E. Pollock, Gary Senner, and Sharon S. Feather, of Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Consolidated.

James J. Rodgers and Benjamin M. Quigg, Jr., of Morgan, Lewis & Bockius, Philadelphia, Pa., for Chef Pierre.

## ADJUDICATION

DITTER, District Judge.

Alleging that a proposed merger of two frozen dessert pie producers will substantially lessen competition, the Anti-Trust Division of the Department of Justice has petitioned this court for a preliminary and permanent injunction. Jurisdiction is founded upon 15 U.S.C. § 25.

The Government contends that the proposed acquisition of Chef Pierre, Inc. by Consolidated Foods Corporation violates section 7 of the Clayton Act. After an eight day trial on the merits, I have decided that the merger does not offend the provisions of section 7, and that all injunctive relief must therefore be refused. Findings of fact and conclusions of law are stated herein. The analysis and discussion in support of this decision will be expressed at length in an opinion to follow.

## FINDINGS OF FACT

1. Consolidated Foods Corporation ("Consolidated Foods") is a Maryland corporation with its principal executive offices in Chicago, Illinois. Consolidated Foods is a diversified company engaged in the businesses of frozen and processed foods, soft drinks and confections, food services, home products and services, commercial products and services and apparel. (Stipulation No. 1, par. 5.) Consolidated is one of the nation's largest industrial corporations (ranked 78th in Fortune's 1977 Directory of the Five Hundred Largest U.S. Industrial Corporations) with total sales of approximately $2.75 billion for its fiscal year ended June 30, 1976 and $2.89 billion for its fiscal year ended June 30, 1977. (Consolidated—Answer, Par. 4 and GX 17.)

2. One of the divisions of Consolidated Foods is the Kitchens of Sara Lee ("Sara Lee"). Sara Lee manufactures and sells approximately 25 varieties of frozen baked goods and dessert products including rolls, cakes, cheese cakes, brownies, pound cake, coffee cakes, cup cakes, breakfast Danish, frozen dessert pies, and international desserts. Frozen dessert pies produced by Sara Lee are unbaked. (Stipulation No. 1, par. 6.)

3. Sara Lee's sales of frozen dessert pies were approximately as follows:

Kitchens of Sara Lee
Sales of Frozen Dessert Pies

| Fiscal Year (July 1 to June 30) | Cases | Dollars |
|---|---|---|
| 1973-74 | 1,179,300 | $7,101,100 |
| 1974-75 | 1,029,400 | 7,535,600 |
| 1975-76 | 827,100 | 5,638,600 |
| 1976-77 | 649,600 | 4,525,100 |

Virtually all of these sales of frozen desserts were to retail customers, as follows:

Kitchens of Sara Lee
Retail Sales of Frozen Dessert Pies

| Fiscal Year (July 1 to June 30) | Cases | Dollars |
|---|---|---|
| 1973-74 | 1,165,600 | $ 7,025,500 |
| 1974-75 | 1,017,400 | 7,445,600 |
| 1975-76 | 811,000 | 5,522,600 |
| 1976-77 | 644,200 | 4,498,200 |

(Stipulation No. 1, par. 6.)

4. Sara Lee does not produce any pies for sale to institutional (sometimes also referred to as "food service") customers. In its fiscal year ended June 30, 1976, Sara Lee sold approximately $116,000 worth of frozen dessert pies produced by it to institutional customers and in its fiscal year ended June 30, 1977, it sold approximately $26,900 worth of frozen dessert pies produced by it to institutional customers, such sales, for the most part, representing sales of retail frozen dessert pie seconds to the State of Texas. (Stipulation No. 1, par. 6.)

5. Sara Lee produces frozen dessert pies on a production line located at its plant in New Hampton, Iowa, and sells or attempts to sell retail frozen dessert pies throughout the United States. (Stipulation No. 1, par. 6.)

6. Sara Lee pies are produced from bulk fruit frozen in a sugar syrup. In the pie making process the fruit is thawed, the natural juices are cooked and thickened with other ingredients and subsequently recombined with the fruit to make the pie filling. (Stipulation No. 1, par. 6.)

7. Sara Lee currently offers for sale only six varieties of retail frozen dessert pies, apple, Dutch apple, peach, cherry, blueberry, and pumpkin, all in a single size (Tr. 7–149 to 7–149a).

8. Sara Lee has a full line of frozen dessert product sales such as cakes and pastries, all of which go through the same distribution system as frozen dessert pies. (Tr. 3–168); (Tr. 5–71 to 72).

9. Sara Lee has the following market shares for the frozen baked goods and dessert products indicated:

| Product | Share of the Market |
|---|---|
| Coffee Cakes | 70% |
| Cheese Cake | 95% |
| Layer Cake | 20% |
| Single Layer Cake | 40-50% |
| Pound Cake | 40-50% |
| Cup Cakes | 20-25% |
| Crumb Cakes | 15-20% |

(Tr. 7–172 to 173).

10. Consolidated Foods distributes food products and related grocery products to volume feeding operations such as restaurants, hotels, industrial cafeterias, schools and hospitals throughout the United States. (Stipulation No. 1, par. 7.)

11. Consolidated distributes food and related products including frozen dessert pies, to the food service industry through its Monarch, Pearce-Young-Angel, Snow Queen, Harrison House, and Booth Fisheries operations. (GX 17; Tr. 8–94 to 95; Tr. 6–41 to 42; Tr. 5–137 to 138). Monarch/Pearce-Young-Angel (Monarch/PYA)

is the nation's third largest distributor in the institutional food service industry (GX 17—Consolidated 1977 Annual report, Page 4; Stip. No. 1, Par. 7).

12. Monarch/PYA or Harrison House engage in food service distribution in Massachusetts; southern New Hampshire; Rhode Island; Connecticut; southern New York; southern New Jersey; Delaware; eastern, southern and western Pennsylvania; Maryland; Washington, D. C.; Virginia; North Carolina; South Carolina; Greater Atlanta Georgia area; northern Florida; California; Nevada; Armadello, Texas; Illinois; western Indiana; southern Wisconsin; Iowa; and Minneapolis, Minnesota. (Tr. 8–94 to 97).

13. Chef Pierre, Inc. ("Chef Pierre") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Traverse City, Michigan. Chef Pierre produces frozen dessert pies at facilities located in Traverse City, Michigan, for sale throughout the United States. Chef Pierre is engaged in the production and sale of both retail and institutional frozen dessert pies. (Stipulation No. 1, par. 9.)

14. Chef Pierre's sales of frozen dessert pies were approximately as follows for the calendar years indicated:

Chef Pierre, Inc.
Sales of Frozen dessert Pies

| Year | Cases | Dollars |
|---|---|---|
| 1974 | 3,085,400 | $23,686,000 |
| 1975 | 3,477,300 | 25,444,000 |
| 1976 | 4,030,100 | 30,012,000 |
| 1977 | 4,336,400 | 36,133,000 |

Most of Chef Pierre's sales of frozen dessert pies were institutional sales, as indicated below:

Chef Pierre Inc.

| Year | Institutional Sales | | Retail Sales | |
| | Cases | Dollars | Cases | Dollars |
|---|---|---|---|---|
| 1974 | | $15,733,000 | | $ 7,953,000 |
| 1975 | 2,374,900 | 17,023,000 | 1,102,400 | 8,421,000 |
| 1976 | 2,870,400 | 21,449,000 | 1,249,800 | 8,563,000 |
| 1977 | 2,960,600 | 25,885,000 | 1,375,800 | 10,248,000 |

(Stipulation No. 1, par. 9.)

15. Chef Pierre's principal line of retail frozen dessert pies is its "Chef Pierre Gourmet Fruit Hi-Pie". "Hi-Pies" are made with fruit which is quick frozen by the

processor in individual pieces ("IQF fruit"). In the production process, the pieces are mixed with sugar and other dry ingredients, heaped in pie crusts and packaged, all without thawing the fruit. The resulting unbaked pie has a mound—or dome-like appearance. The fruit thus retains its natural juices until the pie is baked by the ultimate consumer, at which time the fruit cooks down so that the top crust becomes level. (Stipulation No. 1, par. 9.)

16. The Chef Pierre "Hi-pie" is packaged in a clear plastic wrapping rather than in a box. Frozen dessert pies composed of IQF fruit are more expensive than frozen dessert pies utilizing bulk fruit. Chef Pierre also produces boxed pies utilizing bulk fruit. (Stipulation No. 1, par. 9.)

17. Chef Pierre pies are distributed throughout the United States. Approximately 60% of Chef Pierre's sales of institutional frozen dessert pies are sold under private labels rather than the "Chef Pierre" label. (Stipulation No. 1, par. 9.)

18. Chef Pierre produces more than 40 varieties of frozen dessert pies (Tr. 8–13), while Sara Lee produces only six varieties.

19. On January 30, 1978, the respective Boards of Directors of Consolidated Foods and Chef Pierre approved a merger agreement pursuant to which Chef Pierre is to be merged into Consolidated Foods. The total value of the transaction is approximately $34 million. (Stipulation No. 1, par. 4.)

20. The retail pie business and the institutional pie business are recognized by the food industry as two distinct businesses. (Tr. 2–15; Tr. 7–181; Tr. 8–21 to 8–22.)

21. It is stipulated that the manufacture and sale of retail frozen dessert pies throughout the United States is a relevant line of commerce for purposes of this case. (Stipulation No. 2.)

22. The customers for retail and institutional frozen dessert pies are different; methods of marketing and distribution are different; advertising, packaging and the size and other characteristics of the pies are different, and the price is different. Chef Pierre reports retail and institutional pie sales separately in its Annual Reports and Form 10–K filed with the Securities and Exchange Commission. (Stipulation No. 1, par. 14.) Sara Lee does not produce institutional pies. (Stipulation No. 1, par. 6.)

23. There is little if any substitution between retail frozen dessert pies and institutional dessert pies. (Tr. 8–128.)

24. Retail dessert pies generally are sold through food stores to consumers for home consumption. Most retail frozen dessert pies are eight inches in diameter. (The "Chef Pierre Gourmet Hi-Pie" is nine inches in diameter.) Advertising for retail dessert pies is aimed directly at the consumer. Packaging for retail dessert pies normally is more expensive than for institutional pies because the packaging must be able to attract the consumer's attention. Retail pies normally are more expensive than institutional pies particularly when compared on a price per ounce basis. Brand names are more important in the sale of retail frozen dessert pies than in the sale of institutional frozen dessert pies. (Stipulation No. 1, par. 15.)

25. In addition to frozen pies, many retail stores also sell fresh pies. In some instances such fresh pies are delivered to the store already baked. In other instances the pies are "baked-off" at the store, utilizing frozen pies. (Stipulation No. 1, par. 15.)

26. Institutional frozen dessert pies are sold through institutional food distributors to restaurants, hospitals, schools and other institutions which in turn bake or thaw the pies and sell them to customers by the slice for consumption on the premises. Institutional frozen pies usually are ten inches in diameter, and they normally are packaged in plain boxes.

27. Because retail frozen dessert pies and institutional frozen dessert pies are sold to different customers, a different expertise is required for effective marketing of each category. For example, retail salesmen must be familiar with a producer's advertising program, while institutional salesmen must be able to provide information on nutrition, cost per portion and instructions

for baking. Advertising for food service frozen dessert pies is aimed at the food service operator and is mainly restricted to trade magazines. The packaging for retail frozen dessert pies is more expensive than the packaging for food service frozen dessert pies. Advertising is more important in the sale of retail frozen dessert pies than it is in the sale of food service frozen dessert pies. The end user of food service frozen dessert pies is the food service operator. Many frozen dessert pie producers specialize in either the production and sale of food service frozen dessert pies or the production and sale of retail frozen dessert pies. Due to the special expertise required, a substantial number of brokers only sell to either retail or food service customers. Due to the special expertise required, brokers who sell to both retail and food service customers usually have separate sales forces devoted to either the retail or food service accounts. Due to the special expertise required, a substantial number of distributors distribute only to either retail or food service customers. Due to the special expertise required, distributors who distribute to both retail and food service customers usually have separate sales forces devoted to either retail or food service accounts. Regional frozen dessert pie producers overlap with other regional frozen dessert pie producers. (Stipulation of facts read into the record by Government Counsel on April 26, 1978.)

28. Fresh baked dessert pies are sold on consignment and title does not pass with delivery. Fresh baked dessert pies are sold with a return privilege for pies unsold at the end of their shelf life; frozen pies are not sold with such a return privilege. Fresh baked dessert pies are delivered on a daily basis while frozen dessert pies are delivered on less frequent intervals. Frozen dessert pies are sold in the frozen food cabinet of the grocery store. Fresh baked dessert pies are not purchased by the frozen food buyer of the supermarket chain. Fresh baked dessert pies are delivered by pie producers to individual retail grocery stores and food service accounts.

29. Fresh institutional dessert pies are delivered daily to the restaurant's door already baked and ready to serve. A number of pie companies, including Mrs. Smith's, Fasano, Best, Vern's and others sell both fresh and frozen institutional dessert pies. (Tr. 8–85 to 8–86, 8–102 to 8–103; Tr. 5–146 to 5–147; Tr. 6–103; Tr. 7–119 to 7–120; Tr. 8–7, 8–13, 8–22, 8–42; Tr. 8–64.) Fresh pies compete directly and intensely with frozen pies in the institutional market.

30. Although the institutional dessert pie market is a separate economic entity, this line of commerce includes both fresh and frozen pies. There is no separate institutional frozen dessert pie market.

31. Selling Areas Marketing, Inc. (SAMI) collects from certain food distributors figures which show case-movements from their warehouses. SAMI, through extrapolation and projection using constants and formulas it has developed, publishes data to its subscribers. When found to be inaccurate, SAMI reports are rechecked and revised. It is accepted in the food industry that SAMI reports reflect market shares of retail frozen dessert pies. (GX 13, p. 2; Tr. 2–89 to 90; Tr. 3–158 to 161; Tr. 3–24; Tr. 5–16 to 21; Tr. 6–18 to 10.)

32. Frozen pie producers subscribe to market share data published by SAMI for the sale of retail frozen dessert pies. (Tr. 3–61, Tr. 2–89 to 90; Tr. 6–20; Tr. 8–56).

33. Consolidated subscribes to SAMI reports for frozen sweet goods at an annual cost of $150,000. (Tr. 7–71.)

34. Chef considers SAMI an accurate reflection of market share percentages in the retail frozen dessert pie market. (GX 13, p. 2.)

35. Certain producers of retail frozen dessert pies have considered SAMI reports on market shares to assist in deciding whether to enter another geographic market, (Tr. 2–89; Tr. 6–53 to 54) or to develop and market a new product. (Tr. 5–16 to 21.)

36. Certain producers of retail frozen dessert pies have used SAMI reports on market shares to demonstrate to potential and new customers their market share posi-

tions in various geographic markets. (Tr. 3–24; Tr. 6–18.)

37. Certain producers of frozen dessert pies rely on reports on frozen dessert pies issued by SAMI and use them in their day-to-day business. (Tr. 2–89 to 90; Tr. 3–158 to 161, Tr. 4–63 to 64.)

38. Certain producers of frozen dessert pies may rely on reports on frozen dessert pies issued by SAMI to reflect probable competitors' sales, market trends, competitors' promotional activities, and fluctuations in different types and sizes of frozen dessert pies in SAMI's regional marketing areas. (Tr. 6–18 to 19; Tr. 5–18; Tr. 2–89 to 90.)

39. SAMI reports on 39 regional markets in the United States. The reports are issued every four weeks, 13 times a year. (Tr. 3–51.)

40. SAMI is concerned only with retail data. (Tr. 3–52.)

41. Since SAMI data is based on "warehouse withdrawals," i. e., food withdrawn from wholesale warehouses and sent to food stores, a manufacturers' sale of frozen pies directly to a retail store is not included in the SAMI data base. (Tr. 3–66.)

42. Certain chains that operate warehouses do not report to SAMI. One such non-participating operator is Safeway, a large supermarket chain. (Tr. 3–66.)

43. A "private label" is the brand name of a distributor or group of distributors rather than that of the manufacturer. A private brand pie is boxed with the distributor's label on it, and its manufacturer is not identified. Two or more manufacturers may be authorized to package under the same private label, and when they do, each competes for sales to those distributors who use that private label.

44. Regardless of their aggregate, SAMI does not report private label sales in any geographic area where less than three private brands are sold. (Tr. 3–67 to 3–69.)

45. With a seasonal product, such as pumpkin pie, SAMI's report for a four week period within the product's season will be disproportionately high as contrasted to yearly sales for that product. (Tr. 3–85 to 3–86.)

46. Not all the food service operators in a given SAMI market area report to SAMI and SAMI's 39 market areas do not include all the counties in the United States. SAMI knows that its participating food operators in a given market area "do approximately x percent" of that market. The figures for these operators are therefore "blown-up" to cover the total market. Thus calculated, the 39 markets are added together. Each of the remaining counties which are not included in any SAMI market area are assigned "some value," and these are added as well. The resulting figure is the total sales projection for the entire United States. (Tr. 3–75 to 3–77.)

47. Therefore, the SAMI market figures for the total United States are, in essence, a projection on a projection.

48. Although the existence of regional, geographic submarkets within the United States is a contested matter, the parties have stipulated that the United States as a whole is a relevant geographical market in which to assess the effects of the merger of Chef Pierre and Consolidated Foods. Frozen pies can be and are sold throughout the United States from a single plant. Consequently, producers of frozen pies are able to compete and do compete for customers throughout the United States. Frozen pie companies including Mrs. Smith's, Morton, Banquet, Pet, and Lloyd J. Harriss, as well as Sara Lee and Chef Pierre compete on a nationwide basis. In addition, regional frozen pie producers overlap with other regional frozen pie producers. (Stipulation No. 1, par. 18; Tr. 8–125 to 8–131, 8–134 to 8–135.)

49. Frozen dessert pies are generally produced for inventory rather than to fill specific customer orders, and purchasers of frozen dessert pies are able to look to producers located throughout the United States to meet their requirements of frozen dessert pies. (Tr. 3–123.) Individual producers do not vary to a significant degree the prices of either their retail or their

institutional frozen dessert pies from one geographic section of the country to another. (Tr. 8–130; Tr. 4–162 and 4–163.)

50. Buyers and potential buyers of retail frozen dessert pies and buyers and potential buyers of institutional frozen dessert pies are located throughout the United States. (Stipulation No. 1, par. 18.) Institutional food distributors also are located throughout the United States. (Tr. 4–46.)

51. In 1977, total sales of retail frozen dessert pies were $144,546,000. Sales of retail frozen dessert pies by individual producers in 1977 were:

| Company | Sales | |
|---|---|---|
| Mrs. Smith's | $59,137,000 | (GX 48) |
| Morton's | 15,814,000 | (Stip. No. 3) |
| Ward | 10,490,000 | (Stip. No. 3) |
| Chef Pierre | 10,248,000 | (Stip. No. 1) |
| Harriss | 9,606,000 | (Stip. No. 3) |
| Banquet | 9,400,000 | (Stip. No. 3) |
| Pet | 7,334,000 | (Stip. No. 3) |
| Fasano | 5,195,000 | (Stip. No. 3) |
| Quality | 5,120,000 | (Stip. No. 3) |
| Edwards | 4,636,000 | (GX 6) |
| Sara Lee | 4,498,000* | (Stip. No. 1) |
| Table Talk | 1,980,000 | (Stip. No. 3) |
| Fields | 1,088,000 | (Stip. No. 3) |

*Sales for fiscal year ending June 30, 1977.

Chef's and Consolidated's dollar sales of retail frozen dessert pies in 1977 were 7 percent and 3.1 percent, respectively, of the retail frozen dessert pie market. If the merger is consummated, the combined market share of Consolidated and Chef would be 10.1 percent of the retail frozen dessert pie market and Consolidated would be the third largest producer of retail frozen dessert pies in the United States.

52. According to the Government's exhibits and the stipulations of the parties, total 1977 sales of institutional frozen dessert pies in the United States were $65,860,000. This figure represents the sum of the sales by the following individual producers in 1977:

| Company | Sales | Percent of total | |
|---|---|---|---|
| Chef Pierre | $25,885,000 | 39.30 | (Stip. No. 1) |
| Mrs. Smith's | 15,736,000 | 23.89 | (GX 48) |
| Edwards | 14,484,000 | 21.77 | (GX 6) |
| Harriss | 5,927,000 | 8.99 | (Stip. No. 3 |
| Fasano | 1,544,000 | 2.34 | (Stip. No. 3) |
| Fields | 1,088,000 | 1.65 | (Stip. No. 3) |
| Ward | 641,000 | .973 | (Stip. No. 3) |
| Awrey | 220,000 | .334 | (Stip. No. 3) |
| Table Talk | 112,000 | .170 | (Stip. No. 3) |
| Quality | 107,000 | .162 | (Stip. No. 3) |
| Chef Francisco | 89,000 | .135 | (Stip. No. 3) |
| Sara Lee | 27,000* | .04 | (Stip. No. 1) |

*Consists primarily of sales of retail frozen dessert pie seconds to the State of Texas.

But see the estimates in Finding of Fact No. 69, which differ substantially from this total.

53. Sara Lee frozen pie sales have declined from $7,101,100 in fiscal 1973–74 to $4,525,100 in fiscal 1976–77, a 36 percent decline in dollar sales. During the same period, total retail sales of all companies' frozen dessert pies increased by 45 percent. During this same period, Sara Lee's unit sales have declined 45 percent, from 1,179,300 cases in 1973–74 to 649,600 cases in 1976–77. (Stipulation No. 1, par. 6; Tr. 7–153; Tr. 9–4, 9–6.)

54. Sara Lee is not one of the leading sellers of retail frozen dessert pies. Sara Lee's currently estimated share of all retail frozen dessert pies sold is 1.6 percent (GX 11); in Sara Lee's fiscal 1977 retail frozen dessert pie sales of $4,498,200 (Stipulation No. 1, par. 6) were less than the 1977 retail frozen pie sales of Mrs. Smith's (GX 48), ITT (Morton), Ward Foods (Johnston and Simple Simon), Lloyd J. Harriss, RCA (Banquet), Pet Inc. (Pet-Ritz), Chef Pierre, Fasano, Quality Baking Co. (Mountain Top), (Stipulation No. 3) and Edwards (Tr. 2–174.) (The apparent discrepancy between the estimate of 1.6 percent and the total sales of $4,498,000 may be explained on the basis that the 1.6 percent is an *estimate* of Sara Lee's *current* position as of December 28, 1977. The total sales of $4,498,000 were for the fiscal year ending June 30, 1977. This total when compared to sales of other frozen dessert pie companies for the period

ending December 31, 1977, shows a 3.1 percent share for Sara Lee.)

55. Chef Pierre does not regard Sara Lee as a significant competitor. Thus, Chef Pierre has not priced or promoted its pies against Sara Lee pies. (Tr. 8–27, 8–29.) Similarly, Edwards Pie Co. did not name Sara Lee as a major competitor in the retail frozen dessert pie business (GX 6, p. 4). Neither Mrs. Smith's nor Heinz view Sara Lee as a significant competitor (Tr. 5–60; Tr. 3–32.) No witness testified that the merger would reduce competition between Sara Lee and Chef Pierre. (Tr. 9–7, 9–8, 9–11.)

56. Sara Lee has been forced to discontinue a number of varieties of retail frozen dessert pies due to insufficient sales and poor distribution (Tr. 7–150.) As stated above, Sara Lee now sells only six varieties of retail frozen dessert pies in one size (see finding no. 7, *supra.*) This may be contrasted, for example, with Mrs. Smith's which produces approximately 40 different sizes and varieties of retail frozen dessert pies (Tr. 4–78 to 4–79.)

57. Sara Lee's position in the retail frozen dessert pie market is even weaker than appears from its level of sales. In order for a company to compete successfully in the retail frozen dessert pie business, it is necessary that the company's products be available to consumers on a regular basis. Sara Lee retail frozen pie distribution is spotty (Tr. 7–153). In many of the areas where Sara Lee sells retail frozen pies, only a few chains carry them. Moreover, those stores which do stock Sara Lee pies for the most part only carry apple and possibly pumpkin in season. (Tr. 7–153 to 7–154; 9–4.)

58. Sara Lee's pie sales and distribution are even more seasonal than those of most other pie sellers, since its largest selling variety is pumpkin. For most pie producers, including Chef Pierre, the largest selling variety is apple. Pumpkin pies accounted for 32 percent of all Sara Lee pie sales in fiscal 1976–77 (compared with 18 percent in fiscal 1973–74). Pumpkin and custard pies combined accounted for 17 percent of Chef Pierre retail pie sales in 1977. Sara Lee's

pumpkin pie sales also tend to be more promotional in nature, and are sold on a "fully guaranteed" basis, i. e., Sara Lee agrees to take back all unsold pumpkin pies. (Stipulation No. 1, pars. 6, 9; Tr. 7–154 to 7–155.)

59. Reflecting Sara Lee's marginal position in the frozen dessert pie business, Sara Lee's frozen pie operations have been consistently unprofitable for several years and Sara Lee's outlook for the future of its retail frozen dessert pie business is described by Sara Lee's president, Mahoney, as "very bleak" (Tr. 7–155, 7–161).

60. It has been stipulated that Sara Lee does not produce institutional frozen dessert pies (Stipulation No. 1, par. 6), which as stated in Finding No. 14, represent the major portion of Chef Pierre's sales. (Tr. 9–7, 9–8.)

61. Both retail and institutional frozen dessert pies face significant competition not only from fresh pies but also from home-made pies and other dessert products. Because there is a high degree of substitutability between frozen dessert pies and other dessert items, there is also a significant degree of price sensitivity between frozen dessert pies and other dessert products. If the price of frozen dessert pies were to rise significantly, consumers and food service operators would switch to other dessert products. (Tr. 8–139, 140.)

62. Frozen pie shells, which are used with canned or home-made pie fillings, also compete with pies for retail freezer case space and for the consumer's and food service operator's dollar. (Tr. 4–65 to 4–66; Tr. 8–23; Tr. 8–140.)

63. The retail frozen dessert pie business is characterized by intense competition. (Tr. 6–114; Tr. 7–83.) This competition includes price competition and promotional allowances and activity. (Tr. 5–46 to 5–48; Tr. 4–39 to 4–41.) Sara Lee sells a large portion of its total pie sales through promotions. (Tr. 7–160 to 7–161.) Such promotional activity indicates competitive industry performance. (Tr. 8–163 to 8–164.)

64. To the extent that the retail frozen dessert pie market can be characterized as concentrated, such concentration is largely attributable to a single firm, Mrs. Smith's, which has a market share of approximately 40 percent (Tr. 5–75; Tr. 4–12; Tr. 8–160). High concentration ratios are not regarded as significant by industrial organization economists in the absence of high barriers to entry. In addition, there has been no trend toward concentration in the retail frozen pie market. (Tr. 8–162 to 8–163.) To the contrary new competitors have recently entered the market, Heinz and Mountain Top; existing manufacturers are seeking to expand their product lines; (Tr. 5–16 and 17), and existing manufacturers are expanding into new geographic markets. (Tr. 6–53 and 6–88.)

65. The sale of institutional frozen dessert pies also is highly competitive. (Tr. 6–114; 9–28 to 9–34.) Competitors described the institutional pie business as "viciously competitive" (Tr. 3–188; see also Tr. 5–134).

66. In the institutional dessert pie business, fresh-baked pies compete with frozen pies in sales to food service operators. (See Finding No. 29, *supra*; Tr. 5–146 to 5–147; Tr. 8–89, 8–102 to 8–103; Tr. 8–7, 8–13, 8–22 to 8–23, 8–42; Tr. 8–64; Tr. 7–119 to 7–120.)

67. There are a large number of producers and sellers of retail frozen dessert pies, institutional frozen dessert pies, or both, other than Sara Lee and Chef Pierre. (Tr. 8–160 to 8–161.) They include some large companies of which the frozen dessert pie business is a division: Kellogg Co. (Mrs. Smith's), Pet Inc. (Pet-Ritz), ITT (Morton), RCA (Banquet), Lloyd J. Harriss Pie Co., Ward Foods Inc. (Johnston), Quality Baking Co. (Mountain Top), Edwards Pie Co., Fasano Pie Co., H. J. Heinz Co., Awrey Bakeries Inc., Field's Inc., Vern's Pie Co., Table Talk (Stipulation No. 3), Wick's Pies (Tr. 6–27), Best Pie Co. (Tr. 3–98 to 3–99), Quality Home Bakers/Bowie Pie Co. (Tr. 7–36), Kitchen Made, Gourmaid Frozen Foods, Sterling Pie Co. (Tr. 5–184), Progressive Bakeries, and Jessie Lord Inc./International

House of Pies (Tr. 7–39 to 7–40). In addition, companies including Howard Johnson Co. and Marriott Corp. produce institutional frozen dessert pies for their own use. (Tr. 2–177; Tr. 5–136 to 5–137; Tr. 8–42.) Mrs Smith's also sells its institutional frozen dessert pies to Howard Johnson (Tr. 5–136 to 5–137) indicating the existence of competition between frozen pies produced by restaurant chains for their own use and those purchased from an outside manufacturer.

68. In measuring total production and sale of institutional frozen dessert pies by all manufacturers, frozen dessert pies manufactured by Mrs. Smith's and baked-off and distributed to food service operators through Mrs. Smith's "Pie Kitchens" also must be considered. The Mrs. Smith's "Pie Kitchens" are a means to compete with private label frozen dessert pies and "an attempt to move ahead and build a *frozen pie business*" (Tr. 4–136, emphasis added). The Smith "Pie Kitchens" have also made sales of unbaked institutional frozen dessert pies to Best Pie Company. (Tr. 4–61.) Pie Kitchens' sales were approximately $10 to $11 million in 1976 (Tr. 4–19), and the internal sales reports of Mrs. Smith's Frozen Division for 1977 place an intra-company transfer value of $4.3 million on the frozen pies transferred to the Pie Kitchens (GX 48).

69. The plaintiff has failed to prove that total industry sales of institutional frozen dessert pies were only $58.8 million in 1976 as alleged in the complaint. Edwards Pie Co. estimated that total annual sales of institutional frozen dessert pies are approximately $160 million. (GX 6, p. 3.) The defendants' economic expert, Mr. Oliver, estimated that total sales of institutional frozen dessert pies are at least $100 million annually and may be much higher. (Tr. 9–21 to 9–28.) The lowest estimate ($72 million in 1977) was that of Mrs. Smith's marketing manager for waffle products, Charles Palledino, who virtually ignored most small producers in arriving at his estimate. (Tr. 5-164.) Mrs. Smith's projects however, that sales of institutional frozen dessert pies will total $90 million in 1978

with a 6 percent to 8 percent growth rate. (DX 5A.)

70. The impact of institutional fresh pie sales on the institutional frozen dessert pie market cannot be ignored. (See Tr. 5–146 to 5–147; 8–22 to 8–23.) Total sales of fresh baked institutional pies are estimated to exceed frozen institutional pie sales (Tr. 8–22) and may be as high as $300 million. (Tr. 9–16 to 9–17.) Although there is a retail frozen dessert pie market, there is not an institutional frozen dessert pie market nor is there a frozen dessert pie market.

71. Mrs. Smith's Pie Company alone had institutional fresh pie sales of some $30 million in 1976. (Tr. 4–16.) Fresh pies constituted 85 percent of all revenues from Mrs. Smith's "dessert services group," which consisted of seven facilities serving about 25,000 institutional customers in a nine-state area. (Tr. 4–14.)

72. In assessing whether producers are performing competitively, one of the indicators to which economists look is the level of profitability in the several companies. If there is high profitability which has tended to remain stable over a period of years, this is thought to signify that there is an absence of competition. On the other hand, if profitability is only average or below average in comparison with other industries, this is regarded as an indication that there is competitive performance. Profitability among frozen pie producers approximates at most the average level of profitability for all manufacturing industries. (Tr. 8–138 to 8–139; 8–165 to 8–169; 6–68; 7–46 to 7–47.)

73. Capital requirements necessary to enter the manufacture of frozen dessert pies are not high. Utilizing used machinery one could acquire the necessary equipment to enter the business competitively for as little as $25,000 to $30,000. (Tr. 8–18 to 8–21.) Sources of such used equipment exist in Philadelphia, New York, Chicago, and Los Angeles. (Tr. 8–19.) Chef Pierre plans to build a new production facility in Forest, Mississippi which will virtually duplicate the company's present plant in Traverse City, Michigan, which has a capacity of 20,000 pies per hour. (Tr. 8–18.) The new plant will cost approximately $6 million. (Tr. 8–29 to 8–30.)

74. No significant patents are involved in the manufacture and sale of frozen dessert pies, nor is the technology involved, which is largely common to the fresh-bake pie business and the frozen food industry generally, particularly sophisticated. (Tr. 8–15 to 8–17.)

75. Both the retail and institutional pie businesses are characterized by low levels of advertising and brand differentiation. For example, Mrs. Smith's, which has the largest advertising expenditures for frozen dessert pies, spent approximately $1,418,800 on media advertising (other than newspapers and spot radio) in 1977 (GX 54 and 55). These advertising expenditures represent less than 3 percent of Mrs. Smith's sales of retail frozen dessert pies. This may be compared, for example, with the ready-to-eat breakfast cereal industry, where advertising to sales ratios average 12 percent to 15 percent. (Tr. 8–153 to 8–159.) Mrs. Smith's is the only frozen pie producer which engages in national television advertising. (Tr. 7–61.)

76. Advertising levels are far lower for institutional pies than for retail pies, and institutional pie advertising is limited for the most part to trade magazines. (Tr. 7–65; Tr. 7–62 to 7–63; Tr. 8–24, 8–54.) For example, Mrs. Smith's institutional advertising amounts to only about 0.00003 percent of Mrs. Smith's institutional pie sales. (Tr. 3–135.)

77. Particularly in selling to institutional customers, brand names are not significant. Approximately 60 percent of Chef Pierre's sales of institutional frozen dessert pies are sold under private labels rather than under the Chef Pierre label. (Stipulation No. 1, par. 9.)

78. H. J. Heinz Co. recently entered the manufacture and sale of frozen dessert pies (both retail and institutional) (Tr. 3–4 to 3–5). Mr. Audette of Heinz, which currently produces only cream pies, also recognizes that "[T]here is a good potential" for Heinz'

entry into retail frozen fruit pies and that this capabil‡ty could also be used for institutional fruit pies. (Tr. 3–24, 3–33.) In addition, Quality Baking Co. (Mountain Top) recently entered the production and sale of institutional frozen dessert pies. (Tr. 6–105; Tr. 7–34.) Balta is considering entry into the frozen pie business. (Tr. 4–90.)

79. Subsequent to the announcement of the proposed merger of Chief Pierre into Consolidated Foods, an agreement was reached for the sale of the Lloyd J. Harriss Pie Co. to two persons, one of whom has had some experience in the food industry and is not presently engaged in the pie business. (Tr. 4–34 to 4–38; Tr. 7–67 to 7–68.)

80. There are no significant barriers to entering the manufacture and sale of either retail or institutional frozen dessert pies. (See Tr. 8–142 to 8–160; 9–30 to 9–33.)

81. Sara Lee attempted to produce and sell institutional frozen dessert pies in 1970–72, but decided to cease manufacturing institutional pies because it was unable to achieve an acceptable level of sales or to achieve profitability. In view of its previously unsuccessful attempt to enter the institutional frozen dessert pie business, and in view of its declining position in the retail frozen dessert pie business, Sara Lee cannot be perceived as a likely potential entrant into the production and sale of institutional frozen dessert pies. (Tr. 7–152, 7–164, 7–170 to 7–171; Tr. 8–26.)

82. There are producers of retail frozen dessert pies whose sales exceed those of Sara Lee and who do not currently produce institutional frozen dessert pies. These firms include Morton (which is part of ITT Corp.), Banquet (which is part of RCA), and Pet-Ritz (which is part of Pet Inc.). (Stipulation No. 3.)

83. Firms producing frozen dessert pies measuring less than eight inches in diameter ("mini-pies") for sale to institutional customers must be considered as potential entrants into the production and sale of traditional 10-inch institutional frozen dessert pies. The equipment used to manufacture mini-pies also can be used to produce larger pies. (Tr. 8–161 to 162; 9–48.)

84. Firms producing and selling institutional fresh-baked dessert pies which do not now produce frozen pies also must be considered as potential entrants into the production and sale of institutional frozen dessert pies. (Tr. 8–148 to 150; 9–48; 9–67 to 9–70; 9–78.) Fresh pie producers have all of the equipment and know-how necessary to produce frozen dessert pies, with the exception of packaging and freezing equipment. (Tr. 7–76 to 7–77; Tr. 8–16.) Some fresh pie producers such as Balta Bros., already have freezer capacity. (Tr. 4–90, 4–119.) Several leading producers of institutional frozen dessert pies, including Mrs. Smith's, Lloyd J. Harriss, Chef Pierre, and Edwards, as well as Table Talk and other firms, started out as producers of institutional fresh baked pies. (Tr. 3–134; Tr. 2–169; Tr. 8–7 to 8–8, 8–38.) Edwards, for example, entered the institutional frozen dessert pie business in 1968 and has enjoyed good growth since that time. (Tr. 2–169 to 2–170.)

85. A firm such as Pillsbury Co., which produces institutional dessert pies for its "Poppin Fresh" chain of pie shops, also must be considered as a potential entrant into the production and sale of institutional frozen dessert pies. (Tr. 8–162.)

86. The evidence does not show any perception of Sara Lee as a potential entrant into the manufacture and sale of institutional frozen dessert pies which has in fact tempered oligopolistic behavior by existing institutional frozen dessert pie producers.

87. Institutional frozen food distributors handle products on a non-exclusive basis. That is, unlike brokers, who act as a substitute for the manufacturer's sales force and do not represent competing lines, distributors can, and do, handle competing products. (Tr. 8–85.)

88. Distributors of institutional frozen dessert pies normally sell more than one brand of frozen dessert pie. (Tr. 8–82.) This decision is generally influenced by the distributor's end user institutional customers who often prefer particular brands of

pies. (Tr. 3–93; Tr. 8–113; Tr. 7–121, 7–124.) Thus, in the marketing of institutional frozen dessert pies, producers direct their sales efforts to end-user customers (food service operators) as well as to their immediate customers (institutional food distributors) in order to create demand for their products. (Tr. 3–17; Tr. 5–107, 5–108; Tr. 8–110; Tr. 7–122; Tr. 7–126 to 7–127.) Even when the distributor carries a private-label brand, it is not unusual for him also to sell one or more additional brands. (Tr. 4–27 to 4–28; Tr. 5–121; Tr. 8–88.)

89. Two Consolidated divisions, Monarch/Pearce-Young-Angel ("PYA") and, to a lesser extent, Booth Fisheries, distribute foot products to institutional customers. These divisions are operated as separate profit centers. Consolidated imposes no requirement that these units purchase from Sara Lee, or any other Consolidated units, or refrain from purchasing products competitive with those offered by Sara Lee or any other Consolidated unit. (Tr. 7–156 to 7–157; Tr. 8–92 to 8–93; Tr. 8–73.) On the contrary, Consolidated requires its subsidiary companies to deal with one another at "arm's length." (Tr. 7–157; 8–92.)

90. Monarch/PYA currently distributes frozen dessert products made by various manufacturers, including Heinz and Mrs. Smith's, which are directly competitive with products offered by Sara Lee. (Tr. 8–93; Tr. 3–41 to 3–42.)

91. There are approximately 2400 institutional frozen food distribution outlets in the United States. Mrs. Smith's sells to about 1000 of these, ranging from the largest institutional food distributor, CFS–Continental, Inc., to "any distributor that has the facilities to handle frozen products." CFS–Continental purchases private-label institutional frozen dessert pies from Mrs. Smith's and Harriss. (Tr. 5–119, 5–140; Tr. 5–162, 5–192; Tr. 7–27 to 7–31.)

92. Several producers of institutional frozen dessert pies including Mrs. Smith's and Edwards sell their products directly to food service operators which handle their own distribution, bypassing institutional food distributors with respect to such sales. (Tr. 5–129; Tr. 2–167.)

93. There has been no showing that, if the merger is consummated, present and potential suppliers of institutional frozen dessert pies will be foreclosed from opportunities to sell to Monarch/PYA and Booth Fisheries. (Tr. 8–92 to 8–93; Tr. 8–73.) In any event, even if Monarch/PYA and Booth Fisheries were foreclosed as customers to frozen dessert pie manufacturers other than Chef Pierre, there is no likelihood that such other manufacturers would be foreclosed from effective distribution of their products in view of the nature of the institutional dessert pie market and the availability of multiple distribution outlets and methods available to them.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25.

2. The manufacture and sale of dessert pies is a relevant product market, and the United States as a whole is a relevant geographic market, within which the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods might be measured.

3. The plaintiff has failed to prove any relevant geographic submarket within which there can be measured the probable effect on the dessert pie market of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods.

4. Plaintiff has failed to sustain its burden of proving the boundaries of the dessert pie market because:

(a) Fresh and frozen dessert pies are competing products in this market;

(b) The manufacture and sale of fresh pies is a substantial part of the dessert pie market;

(c) The size of the dessert pie market cannot be measured without considering the manufacture and sale of fresh pies; and

(d) No market statistics were introduced to show the actual size of the dessert pie market.

5. Since the boundaries of the dessert pie market have not been established, the probable effect of the acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation in this market cannot be measured.

6. Market sales statistics do not establish the probable effect on competition in the dessert pie market of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation.

7. The plaintiff has failed to sustain its burden of proving that the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation may be substantially to lessen competition, or to tend to create a monopoly, in the dessert pie market in any section of the country.

8. The manufacture and sale of retail frozen dessert pies is a relevant product submarket, and the United States as a whole is a relevant geographic market, within which the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation might be measured.

9. The plaintiff has failed to prove any relevant geographic submarket within which there can be measured the probable effect on the retail frozen dessert pie market of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation.

10. Market share statistics do not establish the probable effect on competition in the retail frozen dessert pie submarket of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation.

11. The plaintiff has failed to sustain its burden of proving that the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation may be substantially to lessen competition, or to tend to create a monopoly, in the retail dessert pie submarket in any section of the country.

12. The manufacture and sale of institutional dessert pies is a relevant product submarket, and the United States as a whole is a relevant geographic market, within which the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation might be measured.

13. The plaintiff has failed to prove any relevant geographic submarket within which there can be measured the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods on the manufacture and sale of institutional dessert pies.

14. Plaintiff has failed to sustain its burden of proving the boundaries of the institutional dessert pie submarket because:

   (a) Fresh and frozen dessert pies are competing products in this submarket;

   (b) The manufacture and sale of fresh pies is a substantial part of the institutional dessert pie submarket;

   (c) There is no separate institutional frozen dessert pie submarket;

   (d) The size of the institutional dessert pie submarket cannot be measured without considering the manufacture and sale of fresh pies; and

   (e) No market statistics were introduced to show the actual size of the institutional dessert pie submarket.

15. Since the boundaries of the institutional dessert pie submarket have not been established, the probable effect of the acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation in this submarket cannot be measured.

16. Market sales statistics do not establish the probable effect on competition in the institutional pie submarket of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation.

17. The plaintiff has failed to sustain its burden of proving that the probable effect of the proposed acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation may be substantially to lessen competition, or to tend to create a monopoly, in the institutional dessert pie submarket in any section of the country.

18. There are no high entry barriers to the dessert pie market, to the retail frozen dessert pie submarket, or to the institutional dessert pie submarket.

19. The plaintiff has not established that the acquisition of Chef Pierre, Inc., by Consolidated Foods Corporation may be anti-competitive in that there will be eliminated from the institutional dessert pie submarket a potential competitor.

20. The plaintiff has not established that Sara Lee or Consolidated Foods was perceived by anyone as a potential entrant into the institutional dessert pie submarket or that its presence "standing in the wings" in any way tempered oligopolistic behavior on the part of any manufacturers or sellers already in the market.

21. The plaintiff has failed to prove that any substantial vertical foreclosure might result from the proposed merger.

22. The plaintiff has failed to prove that the acquisition by Consolidated Foods of Chef Pierre may substantially lessen competition or tend to create a monopoly in any line of commerce in any section of the country.

## OPINION

This is a civil anti-trust suit in which the Department of Justice has sought an injunction prohibiting the merger of two frozen dessert pie producers, Consolidated Foods Corporation and Chef Pierre, Inc. On May 10, 1978, I issued an order accompanied by my Findings of Fact and Conclusions of Law, in which I denied all injunctive relief. This opinion will set forth my reasoning and analysis in support of that ruling.

Through its Anti-Trust Division, the Justice Department filed the complaint in this matter on April 13, 1978,[1] charging that the proposed merger would violate section 7 of the Clayton Act.[2] Jurisdiction is vested in this court by section 15 of the Clayton Act.[3]

An eight day trial produced a record of some 1600 pages, together with a substantial quantity of exhibits. After reviewing these materials and the able arguments of counsel, I concluded that the Government failed to sustain its burden of proof, and that a violation of section 7 of the Clayton Act had not been shown.

■ As with any section 7 case, in order to resolve the issues presented, my task is "to describe the companies involved, analyze the product and geographic market in which they compete, and explore the structure of the industry affected by the merger, to the end that we may properly assess the probable effects of the merger on competition." *Stanley Works v. F.T.C.*, 469 F.2d 498 (2d Cir. 1972).

### I. *The Companies and the Industry*

Consolidated Foods Corporation is a large conglomerate, ranking 78th in Fortune's 1977 Directory of the Five Hundred Largest U.S. Industrial Corporations. One of Consolidated's divisions is the Kitchens of Sara Lee, a major producer of dessert products. While Sara Lee is an industry leader with regard to such sales as cheese cake and coffee cake, controlling 95 percent of the former and 70 percent of the latter, the company's sales of frozen dessert pies have been conspicuously unimpressive. Indeed, Sara Lee's frozen pie sales declined from over $7 million in 1973–74 to about $4.5 million in 1976–77 despite an expanding market during that period.[4]

---

1. The history of this litigation and the procedural posture in which it stands are explained in a separate opinion denying the government's motion for a new trial.

2. Clayton Act, § 7, 15 U.S.C. § 18 provides in relevant part:
   No corporation engaged in commerce shall acquire directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

3. 15 U.S.C. § 25.

4. According to figures contained in GX 6, GX 48, Stipulation No. 1, and Stipulation No. 3, total 1974 retail frozen dessert pie sales in the United States were $127,723,000. By 1977, the total had climbed to $144,546,000, for a market increase of approximately 13.1%. During the same period, however, Sara Lee's retail pie sales suffered a 36% *decline*.

Chef Pierre, Inc., is a Delaware corporation with its principal place of business in Traverse City, Michigan. At its Traverse City plant, Chef produces a wide variety of frozen dessert pies, and it markets them with considerably greater success than does Sara Lee. Chef's total frozen pie sales in 1977 exceeded $36 million.

To understand the frozen dessert pie business, one must grasp at the outset the important distinction between retail and institutional sales. Retail pies are generally sold through supermarkets and grocery stores to consumers for home use. Most retail frozen dessert pies are eight inches in diameter, and their packaging is design-oriented in order to attract the consumer's attention. Institutional pies, on the other hand, are sold through food distributors to restaurants, hospitals, schools, etc., to be consumed by the slice on the premises. These pies typically are ten inches across and they are packaged in plain boxes.

For all practical purposes, Sara Lee's sales are exclusively retail. In 1976–77, the company had less than $27,000. in institutional sales, and these consisted primarily of retail pie seconds sold to the State of Texas. Sara Lee's $4.5 million volume placed it eleventh among thirteen major retail frozen dessert pie producers in 1977, with 3.1 per cent of the retail market.

Chef Pierre, by contrast, leads the field of institutional frozen dessert pie manufacturers. Chef's $25 million in sales, amounted to 39.3 percent of the institutional frozen pie business in 1977. In addition, the company does a respectable retail trade as well. Its $10,248,000 in sales makes Chef Pierre the fourth ranked producer with seven percent of the retail market.

Institutional frozen dessert pies are sold, for the most part, through institutional frozen food distributors, of which there are some 2,400 throughout the United States. Three of these, Monarch/Pearce-Young-Angel, Harrison House, and Booth Fisheries,

are owned by Consolidated. It is a common practice for a distributor or a group of distributors to adopt a "private label." When a manufacturer sells to such a distributor, he packages the pies under the appropriate private label rather than his own brand name. About 60 percent of Chef Pierre's institutional pies are sold in this manner.

A factor that must not be overlooked in analyzing the frozen dessert pie business is the degree of competition from other dessert products in general, and from fresh pies in particular. Because of the high degree of substitutability, there is considerable price sensitivity between frozen pies and other dessert products. Thus, if the price of frozen pies was to rise significantly, consumers and institutional food service operators would probably switch to other dessert products. This is particularly true with regard to institutional frozen pies, which must combat very keen competition from fresh pies.

## II. *The Relevant Product Markets*

Having briefly described the companies and the industry in which they compete, I must define the product market or line of commerce in which the effects of this merger are to be measured. The government argues that frozen dessert pies constitute a relevant product market for the purposes of this case, and that retail frozen dessert pies and institutional frozen dessert pies are two relevant submarkets.

█ The parties have stipulated that retail frozen dessert pies are a relevant submarket, and I have no quarrel with their conclusion. In *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court explained that within a broad product market, "well-defined submarkets may exist which, in themselves, constitute product markets for anti-trust purposes." 370 U.S. at 325, 82 S.Ct. at 1524. The Court identified cer-

---

A general market increase was enjoyed by institutional pie producers as well. Total institutional sales in 1974 were $53,124,000. In 1977, the total rose to $65,860,000 for a boost of almost 24%. Sara Lee, for all practical purposes, did not participate in the institutional market.

tain "practical indicia" which might be examined in order to define the boundaries of such a submarket. These included "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. at 1524 (footnote omitted). It is clear that a submarket may exist where less than all these criteria are met. *General Foods Corporation v. F.T.C.*, 386 F.2d 936 (3d Cir. 1967), cert. denied, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); *United States v. Black and Decker Mfg. Co.*, 430 F.Supp. 729 (D.Md.1976). In fact, the presence of as few as three *Brown Shoe* indicia has been held to define a distinct submarket. *Reynolds Metal Co. v. F.T.C.*, 114 U.S.App.D.C. 2, 309 F.2d 223, 227 (1962).

■ Under several of these criteria, retail frozen dessert pies qualify as a separate submarket. A number of witnesses testified that the industry and the public both recognize this submarket as a separate economic entity. Selling Areas Marketing, Inc. (SAMI) is a research firm owned by Time-Life, Inc., which measures the market shares of producers within a given industry in various geographic sections of the country. The data it produces is purchased at considerable expense by manufacturers in the frozen pie industry and it is relied upon by them in developing their marketing strategies. SAMI data is strictly oriented to retail sales and it recognizes the retail submarket as a separate economic concern. Chef Pierre reports retail and institutional sales separately on its Form 10–K reports filed with the Securities and Exchange Commission.

Furthermore, the packaging of retail frozen pies is a distinct characteristic since it must attract the consumer's attention, while institutional pies are packaged in plain boxes. Retail frozen pies are also more expensive than institutional pies, especially on an ounce for ounce basis. Finally, there clearly are specialized vendors for retail frozen pies. Many food brokers, acting as sales agents for manufacturers, specialize in the sale of retail pies, and those that sell both retail and institutional maintain separate staffs for each. Thus, I have no problem agreeing that the sale of retail frozen dessert pies constitutes a relevant line of commerce within which to measure the effects of this merger.

■ The government further argues that, like their retail counterparts, institutional frozen dessert pies also constitute a relevant product market. I cannot agree with this contention. It is clear from the evidence presented at trial that institutional frozen dessert pies compete so regularly and intensely with institutional fresh pies that together they constitute a relevant line of commerce. To divide them into separate product markets is inconsistent both with economic reality and with the purposes of the Clayton Act.

■ Even under the highly mechanical approach of the seven *Brown Shoe* criteria, supra, it appears that fresh and frozen institutional pies should be included within the same product market. Noting once again that fewer than all the criteria need be satisfied, a number of qualities common to both fresh and frozen institutional pies can be gleaned from the record. While one product is frozen and the other is not, the end uses of both are identical. Manufacturing facilities for both products are virtually the same, with the sole exception that one involves a freezer and the other an oven at the end of an otherwise identical production line. The ultimate customers for both are absolutely the same, and prices are quite similar. Variations in the prices of fresh and frozen institutional pies are caused by the same factors, i. e., labor, ingredient, and overhead costs. There was also testimony that each is sensitive to changes in the price of the other.

■ Application of the *Brown Shoe* criteria, therefore, requires that fresh and frozen institutional pies be included in the same product market. Were this to end the inquiry however, there would be no basis for excluding fresh pies from the *retail*

market, for many of the similarities noted above also exist between fresh and frozen retail pies. Nevertheless, this record does not contain any indication of substantial competition between fresh and frozen pies on the retail side. If such competition exists, it is not shown by the evidence presented in this case. Absent a showing of competition between the two products, there is no justification for including them in the same product market, despite the presence of certain similarities under the *Brown Shoe* indicia. See *United States v. Connecticut National Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974).

As to institutional pies, by contrast, there is compelling evidence in favor of a finding that fresh and frozen pies are fiercely competitive. No fewer than five Government witnesses and at least one defense witness testified that fresh and frozen pies compete with one another at the institutional level. At the same time, *no* witness testified that they did *not* compete. Mrs. Smith's Pie Co., the largest dessert pie producer in the United States, developed its pie "Kitchens", in which frozen pies are baked in regional facilities and sold as fresh, as an "end-run" around fresh pies, for the express purpose of meeting competition posed by fresh pies to the company's institutional frozen pie business. The Kitchen operation accounted for ten to eleven million dollars in sales during 1977. The evidence also showed that one large distributor actually discontinued its line of Mrs. Smith's frozen institutional pies because of the intense competition from Mrs. Smith's fresh pies. There was further testimony that this distributor had also lost a large institutional buyer of Smith's frozen pies to Smith's fresh operation, and that it was trying to persuade other buyers of fresh pies to switch to frozen. At the same time, one fresh pie company was said to be "reeling" under the pressure of competition from the frozen industry. Finally, it should be noted that, like many current frozen pie companies, Chef Pierre itself had its genesis in the fresh pie field, and entered the frozen industry when market conditions made it opportune to do so.

Thus, the record is replete with evidence showing that fresh pies compete regularly and intensely with frozen pies on the institutional level. The presence of such competition cannot be ignored in defining the perimeters of a relevant product market. Particularly instructive on this point is the Supreme Court's decision in *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). There the Court held that in defining a relevant product market, "complete inter-industry competitive overlap need not be shown." 378 U.S. at 457, 84 S.Ct. at 1747. Rather, said the Court, "we must recognize meaningful competition where it is found to exist." 378 U.S. at 449, 84 S.Ct. at 1743.

The *Continental Can* case presented the question of whether glass jars and bottles could be included in the same relevant product market as metal cans. The Court recognized that metal and glass containers had different characteristics which might disqualify one or the other from various particular uses, and that the machinery used to pack one is different from that used to pack the other. Furthermore, particular users of glass or metal did not shift back and forth as the day-to-day variations in price and other factors might make desirable. In fact, interindustry competition was found to be different from that within the respective can and glass industries themselves. Yet, in spite of these clear distinctions, the court found the two products to fall within the same line of commerce for section 7 purposes. The differences between the products were "relevant and important . . . but they are not sufficient to obscure the competitive relationships which this record so compellingly reveals." 378 U.S. at 450, 84 S.Ct. at 1743. This "competitive relationship" was revealed in a number of ways. Advertising and other marketing techniques were utilized to promote the advantages of one product as opposed to the other. Both the glass and the metal industries engaged in technological development in order to meet the interindustry competition. The Court also noted that

buyers occasionally shifted from one type of container to the other. 378 U.S. at 450–52, 84 S.Ct. at 1743–44.

Similarly, in the instant case, as noted above, manufacturers and brokers of both fresh and frozen pies engaged in marketing efforts to lure away buyers of the other product. Furthermore, technological developments like the pie "Kitchens" were intended to enlarge the areas in which frozen pies could successfully compete with fresh pies. Above all, it was clear that some buyers of fresh pies had switched to frozen, and that frozen buyers had similarly switched to fresh.

■ As the Supreme Court stated, "that the competition here involved may be called 'inter-industry competition' and is between products with distinctive characteristics does not automatically remove it from the reach of § 7." *United States v. Continental Can Co.,* 378 U.S. at 452–53, 84 S.Ct. at 1745. Rather, on this record I conclude that fresh and frozen institutional dessert pies must be included within the same relevant product market.

This holding is supported by other decisions. In *United States v. Aluminum Co. of America,* (Alcoa-Rome), 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314, reh. denied, 377 U.S. 1010, 84 S.Ct. 1903, 12 L.Ed.2d 1057 (1964), the Supreme Court decided that insulated aluminum conductor could be included in the same product market as bare aluminum conductor because both products are used for the same purpose and both are sold to the same customers.[5] 377 U.S. at 276–77, 84 S.Ct. at 1287.

In *United States v. Connecticut National Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), the Court reiterated its previous admonition that " 'complete inter-industry competitive overlap need not be shown' " and " 'we must recognize meaningful competition where it is found to exist.' " 418 U.S. at 662, 94 S.Ct. at 2793. Concededly, the majority went on to hold that the District Court had erred in placing savings banks within the same product market as commercial banks. The Court's reasoning, however, is entirely consistent with the result I reach in the instant case. The Court pointed out that although savings banks had made considerable strides toward "parity" with commercial banks, the latter could still offer a unique "cluster of services" that the former could not, especially to commercial customers.[6] This was not to say, however, that savings and commercial banks could never be included in the same product market. On the contrary, the majority noted that savings banks were still developing, and that at some point in the development process it would become unrealistic to separate the two any longer. In dictum, the Court suggested that this point would be reached "when and if savings banks become significant participants in the marketing of bank services to commercial enterprises." 418 U.S. at 668, 94 S.Ct. at 2795.

This emphasis on customers is particularly telling, since the record before me discloses no meaningful distinction between

---

**5.** The court also concluded that insulated aluminum conductor formed a different product submarket than that of insulated copper conductor. The reasoning in support of this decision is not contrary to my conclusion in the instant case. The Court stated first that the admitted competitiveness between the two products was sufficient to warrant their inclusion in a single product market. The Court then reasoned that substantial differences between the products justified their division into distinct submarkets. These differences included the facts that aluminum conductor is "intrinsically inferior" to copper for most purposes, and that the prices of the two items "do not respond to one another." By contrast, the evidence in the instant case demonstrates that fresh and frozen pies are of equivalent quality, and that their prices are based on the same factors, the most important of which is ingredients, and therefore that they tend to move together.

**6.** This "cluster of services" had been previously identified as the distinguishing feature of full service commercial banking institutions. See *United States v. Phillipsburg National Bank and Trust Co.,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

the customers for fresh and frozen pies in the institutional market.[7]

■ Having decided that fresh pies must be included along with frozen in the institutional dessert pie submarket, I come to the inescapable conclusion that the Government has failed to sustain its burden of defining this submarket's elements and boundaries. This is not to say that the submarket has not been shown to exist. On the contrary, it is clear that there is an institutional dessert pie submarket distinct from the retail side, and that the components of this line of commerce are fresh and frozen institutional dessert pies. What we are lacking is any evidence as to the actual dimensions of the fresh institutional dessert pie trade. The Government has failed to show who the fresh pie producers are, or what their individual and collective sales may be. There has been no showing as to whether fresh pie sales are stronger in some parts of the country than others. We have no data as to whether certain varieties of fresh pies are more desirable, or whether fresh pie sales are subject to seasonal variations. In short, the fresh pie business has not been described with any specificity at all.[8] Absent such a description, the institutional dessert pie submarket has not been completely defined and the effect of the Consolidated-Chef Pierre merger on competition in this line of commerce cannot be accurately measured. The Government has failed to establish "the appropriate setting for judging the probable anticompetitive effect of this merger." *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 n. 38 (1962); see *American Medicorp, Inc. v. Humana Inc.* 445 F.Supp. 589, 604–05 (E.D.Pa.1977).

The Government also argues that the retail and institutional submarkets together form the broader product market of frozen dessert pies for all end users. Since I have concluded, however, that fresh pies are a part of the institutional submarket, they are also a part of the broader product market. Furthermore, since I have also found that the institutional submarket has not been properly defined, it follows that the outer boundaries of the broader product market have not been established, and the effects of the merger on this market cannot be ascertained. I hold therefore that on this record, the only line of commerce within which the anticompetitive effects of this merger can be judged is the retail frozen dessert pie market.

III. *The Relevant Geographic Market*

■ Having discussed the relevant product markets, I now turn to the question

---

7. The Third Circuit's decision in *General Foods Corporation v. F.T.C.,* 386 F.2d 936 (3d Cir. 1967), cert. denied, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968), is also not contrary to my conclusion that fresh and frozen institutional pies must be included in the same product market. The appellant in *General Foods* challenged a finding by the Federal Trade Commission that the appropriate line of commerce was household steel wool. It was argued that this market should have also included numerous nonsteel wool products. The Third Circuit affirmed the Commission's finding on the ground that there was definite industry recognition of the household steel wool submarket as a separate economic entity, that steel wool pads have peculiar characteristics and uses, and that the prices of household steel wool products display no sensitivity to prices of nonsteel products. 386 F.2d at 940–42. Here, by contrast, there is little evidence that the industry recognizes either fresh or frozen institutional pies as a separate economic entity. Certainly, the public makes no such distinction since the products are identical in every respect when they reach the ultimate consumer. As to particular characteristics and uses, it is true that one pie is fresh while the other is frozen, but here the distinction ends. The products are virtually the same in size, shape, appearance and ingredient formulation. Finally, I have previously noted that their prices tend to move together in response to the same stimuli.

8. It is clear that the fresh pie business is no minor economic consideration. The defendant's expert witness, an economist, estimated that fresh pies accounted for at least $100 million in sales annually, and that the actual figure may be as high as $300 million. A Government witness from Mrs. Smith's testified that his company alone has some $30 million in yearly fresh pie sales. This is highly impressive when compared with the fact that according to the Government's exhibits and the stipulations of the parties, total institutional *frozen* pie sales were $65,860,000 in 1977.

of what section or sections of the country are appropriate for measuring the anticompetitive effects of the Consolidated-Chef Pierre merger. The parties have stipulated that one appropriate section of the country in which to examine the effects of the merger in the retail frozen dessert pie market is the United States as a whole.

The evidence shows that most producers of retail frozen dessert pies manufacture their product at a single plant and sell the pies throughout the country. Frozen pies have a virtually unlimited shelf-life. This makes it possible to produce them to inventory and ship them long distances by means of large refrigerated trucks. Thus, Chef Pierre produces pies at its plant in Traverse City, Michigan and ships them to every state in the Union. Mrs. Smith's Pie Co. has a manufacturing facility in Oregon which services an eleven-state area in the West. The remainder of the country is supplied by Mrs. Smith's Pottstown, Pennsylvania, plant.

Transportation costs are not a significant factor, and prices are fairly uniform throughout the country. Thus, a retail frozen pie sold in Maine will cost roughly the same as one sold in California. There are certain regional preferences as to some varieties of pie, but many other varieties enjoy equal popularity throughout the nation. For these reasons, buyers of retail frozen dessert pies are able to look to the entire nation for sources of supply.

This is compelling evidence in support of the parties' stipulation, and I have no trouble agreeing that the United States as a whole is an appropriate "section of the country" in which to measure the effects of this merger on the retail frozen dessert pie market.

The Government also argues that in addition to the national market, there are 39 regional submarkets, defined by SAMI, within which to examine the effects of the merger on the retail trade. SAMI is a research firm which collects and publishes market data about household consumables sold through supermarkets. One of SAMI's categories is frozen dessert pies—there are numerous others ranging from baby food to toothpaste. SAMI has established its 39 areas on the basis of certain criteria which it considers significant for all its subscribers. SAMI areas follow geographic boundaries. A given county will be included in a certain metropolitan area if more than 50 percent of its inhabitants are exposed to media advertising, principally TV, originating from that city. Two other elements are important in determining SAMI areas: a big factor is the marketing area accepted by the retail supermarket trade while the other is the availability of data. As to defining any specific SAMI area, these factors may not have been considered while possibly others, not revealed by the record, were. In any event, the same geographic area, however selected, pertains to all SAMI categories, i. e., butter, fireplace logs, frozen corn, frozen pies, etc.

In this case, the Government contends that in seven SAMI geographic areas, "the defendants have such high market shares as measured by SAMI that the Government has proven a *prima facie* case of a violation of Section 7." *Government's Post-Trial Memorandum of Law,* at 11. I am urged to look at these seven areas in particular because, due to the defendants' high market shares, the effect of the merger will be "direct and immediate."

The following table, compiled from Government Exhibits 8, 9, and 10, shows the seven trading areas referred to by the Government, together with the individual and combined market shares of Consolidated and Chef Pierre as calculated by SAMI for the 4, 12, and 52 week periods immediately preceding November 18, 1977:

| Trading Area | Time Period | Consolidated Market Share | Chef Market Share | Combined Market Share |
|---|---|---|---|---|
| Chicago | 52 weeks | 9.32 | 18.77 | 28.09 |
| (GX 8) | 4 weeks | 25.25 | 12.63 | 37.88 |
| | 12 weeks | 16.88 | 16.39 | 33.27 |

| Trading Area | Time Period | Consolidated Market Share | Chef Market Share | Combined Market Share |
|---|---|---|---|---|
| Detroit | 52 weeks | 3.94 | 12.19 | 16.13 |
| (GX 8) | 4 weeks | 6.41 | 12.00 | 18.41 |
|  | 12 weeks | 5.94 | 13.46 | 19.40 |
| Milwaukee | 52 weeks | 2.00 | 49.65 | 51.65 |
| (GX 8) | 4 weeks | 6.64 | 51.03 | 57.67 |
|  | 12 weeks | 5.69 | 48.60 | 54.29 |
| Minneapolis- | 52 weeks | 4.14 | 69.91 | 74.05 |
| St. Paul | 4 weeks | 10.15 | 68.70 | 78.85 |
| (GX 8) | 12 weeks | 8.76 | 67.22 | 75.98 |
| Omaha- | 52 weeks | 1.49 | 36.29 | 37.78 |
| Des Moines | 4 weeks | 3.90 | 37.77 | 41.67 |
| (GX 8) | 12 weeks | 3.12 | 46.47 | 49.59 |
| Denver | 52 weeks | 10.20 | 12.01 | 22.21 |
| (GX 9) | 4 weeks | 15.21 | 10.83 | 26.04 |
| Jacksonville- | 52 weeks | .29 | 1.80 | 2.09 |
| Tampa | 4 weeks | 1.01 | 2.32 | 3.33 |
| (GX 10) | 12 weeks | .64 | 2.48 | 3.12 |

Except for the Jacksonville-Tampa figures,[9] the market shares indicated in this table are clearly significant, and if I were to conclude that these seven trading areas are appropriate "sections of the country" within the meaning of the Clayton Act, then the Government might well have succeeded in establishing a *prima facie* case. Indeed, I am mindful of the admonition that in defining appropriate geographic markets, "[t]he proper question to be asked . . . is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *United States v. Philadelphia National Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). Nevertheless, for several reasons I am persuaded that none of the SAMI trading areas can serve as an appropriate "section of the country" in which to judge the effects of the merger on the retail frozen dessert pie market. In the words of Mr. Justice Clark, and with apologies to all who read this opinion, "We do not believe that the pie will slice so thinly." *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 331, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961).

First, I have some doubts about the dates of the SAMI reports which the Government has chosen to use. The table above reports on the 4, 12, and 52 weeks periods immediately preceding November 18, 1977. The trial of this matter took place in late April of 1978. It seems curious that the Government chose to use a SAMI report that was

9. It is obvious from an examination of Government Exhibits 8, 9, and 10 that the first six trading areas to which reference is made, Chicago, Detroit, Milwaukee, Minneapolis-St. Paul, Omaha-Des Moines, and Denver, were selected by extracting the most significant Sara Lee totals and then cross-matching them area by area, against Chef Pierre totals. The fact that only six areas could be identified by this method is in itself significant. The basis of selecting the seventh area, Jacksonville-Tampa, where Mrs. Smith's share is 71.8 percent and Sara Lee's and Chef Pierre's are only 1.01 and 2.32 percent respectively, quite escapes me. In any event, there was no other evidence to support the contention that any of these areas have particular significance, economic relevance, special factors, transportation problems, local laws, barriers, habits, traditions, distribution differences, or anything else that would mark any of them as distinct or important for competitive purposes.

five months old when these reports are published every four weeks and a SAMI representative appeared as a witness. A possible answer to this puzzle may lie in the impact of pumpkin pie sales. Pumpkin pie accounted for 32 percent of Sara Lee's total retail frozen dessert pie sales in 1976–77, and 37 percent of the company's unit or case sales.[10] This an abnormally large percentage.[11] It was testified that pumpkin pie is a highly seasonal product, and its sales extended only from August through November. Therefore, a SAMI report of pumpkin pies withdrawn from wholesale warehouses for the four-week period just before Thanksgiving will show a higher market share for Sara Lee than would any other period throughout the year.

Secondly, I find the whole SAMI system suspect as a tool for defining geographic markets in anti-trust cases. While certain factors may be important in outlining one SAMI area, a completely different set of factors may be used as to the next. The availability of data is important—thus, if SAMI cannot obtain information as to an otherwise significant market area, that area may be ignored to some extent in some instances, but not necessarily in others. Although there is only one market area for all SAMI categories, the economic factors which may be important as to the supermarket sale of toothpaste may have nothing to do with the economic factors which are important as to the retail sale of frozen corn. A county will be included if 50 percent of its population is exposed to media advertising—especially TV—whether that advertising deals with supermarket sales of fireplace logs, baby food, frozen dessert pies, or no supermarket items at all. A majority of the supermarket trade, whatever that may be, might well agree that certain geographic areas are significant for its purposes. It does not follow, however, that these same areas have any particular significance so far as the sale of frozen dessert pies are concerned. In this case, we are

concerned with frozen pies, not toothpaste, not fireplace logs, not baby food, and not the myriad of other items which consumers purchase at supermarkets. The countless considerations, compromises, and contingencies, known and unknown, which go into the determination of SAMI markets leave them too vaporous and ethereal for anti-trust purposes.

In addition, SAMI data is based on "warehouse withdrawals," i. e., merchandise withdrawn from wholesale warehouses and sent to supermarkets. Therefore, a manufacturer's sale of frozen pies directly to a retail store is not included in the SAMI data base. Furthermore, some retailers that operate their own warehouses do not report to SAMI. Among them is Safeway, one of the largest supermarket chains in the United States. Additionally, distributors' private label sales are not reported to SAMI in any geographic area where less than three private label brands are sold. This is true regardless of how large private label sales in the area may be. Finally, not all the food warehouse operators in a given SAMI market area report to SAMI, and SAMI's 39 market areas for retail frozen pies do not include all the counties in the United States. SAMI knows, or claims to know, that its warehouse operators in a given market area "do approximately x percent" of that market. This "x" figure is then "blown up" to reach a projection for the market area as a whole. Obviously, any mistake is magnified by whatever multiplier is involved. The figures in the Government's table therefore are projections, not actual totals. To arrive at a market share figure for the entire United States, the 39 markets, each conjectured as described above, are added together. Then each of the remaining counties which are not included in any market area are assigned "some value," and these are added as well. The resulting total is SAMI's nationwide sales estimate, essentially a projection on a projection.

---

10.  Stipulation No. 1.

11.  The combined sales of pumpkin and custard pies amounted to only 17 percent of Chef

Pierre's total retail frozen dessert pie dollar sales, and 19 percent of case sales in 1977. Stipulation No. 1.

It is true that the industry relies on SAMI as an indicator of market trends, and manufacturers regularly purchase the reports at considerable expense. Indeed, I have no doubt that SAMI is a useful tool in a manufacturer's development of marketing techniques. Nevertheless, in light of the deficiencies and limitations noted above, I cannot attribute to the SAMI projections the kind of talismanic quality urged upon me by the Government.

Most importantly, to find that any of the 39 SAMI trading areas is an appropriate section of the country within the meaning of section 7 would be inconsistent with the clear command of precedent. The Government correctly points out that in *United States v. Philadelphia National Bank,* supra, we are told to look where "the effect of the merger on competition will be direct and immediate." 374 U.S. at 357, 83 S.Ct. at 1738. One need not read on very far, however, to find that "[T]his depends upon 'the geographic structure of the supplier-customer relations.'" Id. (citation omitted). The Court went on to explain that the "'area of effective competition in the known line of commerce must be chartered by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies.'"* Id. at 359, 83 S.Ct. at 1739 (emphasis supplied by the Court), citing *Tampa Electric Co. v. Nashville Coal Co.,* supra, 365 U.S. at 327, 81 S.Ct. at 628.

This statement by the Court, particularly the part which it emphasized, is highly significant for our purposes. It is clear from the evidence that purchasers of retail frozen dessert pies are in no way subject to geographical limitations in the areas to which they can turn for sources of supply. On the contrary, as one witness so tartly put it, with frozen pies "the world is your onion." As seen earlier, the manufacturers

typically produce their pies at one or two central plants and ship them throughout the nation. Thus, Mrs. Smith's is in Pennsylvania and Oregon, Chef Pierre is in Michigan, and Sara Lee is in Iowa, all selling pies across the country. Since the frozen pies are physically capable of being shipped long distances, and since transportation costs are not a significant factor, the purchasers in turn can and do look to the entire nation for suppliers.

In *Tampa Electric v. Nashville Coal Co.,* supra, the Supreme Court rejected the argument that the States of Florida and Georgia constituted an appropriate "section of the country" where the product market was the sale of coal. The Court noted that most of the coal sold from the same production area that served Florida and Georgia was marketed in other parts of the country. Therefore, it was unrealistic to say that this two-state region was the effective area in which the producers competed. 365 U.S. at 331–32, 81 S.Ct. at 630. Similarly, it is clear that most of the pies manufactured by the producers who serve any given SAMI trading area, including the seven to which the Government has made special reference, are sold in other areas of the country.

For example, while Mrs. Smith's, Morton, Harriss, Sara Lee, Banquet, Johnston, Mountain Top, Chef Pierre, and Pet Ritz all sell retail frozen desserts pies in the Chicago trading area, the bulk of their pies is sold elsewhere. At the same time, purchasers of retail frozen dessert pies in Chicago are hardly limited to the boundaries of the local SAMI trading area for their source of supply. On the contrary, they buy from manufacturers located in every part of the United States.

Under the teachings of *Tampa Electric*[12] and *Philadelphia National Bank,* therefore, it is clear that the SAMI trading areas are not appropriate sections of the country in

---

12. The plaintiff argues that since the *Tampa Electric* case was a private anti-trust action under § 3 of the Clayton Act, it has no bearing on this action brought by the Government to enjoin an alleged violation of § 7. *Tampa Electric,* however, was relied upon by the Supreme Court while resolving the geographic market issues in *Philadelphia National Bank,* which was plainly a Government § 7 action. 374 U.S. at 359, 83 S.Ct. at 1739. It is certainly appropriate therefore, to be guided by the principles of *Tampa Electric* in defining the proper "section of the country" here.

which to measure the effects of this merger on competition in the retail frozen dessert pie market.[13]

This conclusion is supported by other authorities as well. In *Brown Shoe*, supra, the Supreme Court stated that the geographic market must " 'correspond to the commercial realities' of the industry and be economically significant." 370 U.S. at 336–37, 82 S.Ct. 1530, quoting *American Crystal Sugar Co. v. Cuban American Sugar Co.*, 152 F.Supp. 387 (S.D.N.Y.1957), aff'd 259 F.2d 524 (2d Cir. 1958). In my view, neither requirement is satisfied here. SAMI trading areas "correspond to commercial realities" only in the sense that they are convenient devices for measuring the warehouse withdrawals of the varied products sold at retail by supermarkets. This is their purpose and this is their use. They are of little value, however, in defining the area of effective competition among producers of retail frozen dessert pies. Moreover, although the Government quotes this very language in its brief, it has made no showing that any SAMI trading area is of particular economic significance to the pie industry.

Also instructive is the concurring opinion of Mr. Justice Harlan in *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (Harlan, J., concurring), which quotes the Senate report dealing with geographic market as follows:

The Senate Report which discusses the "section of the country" requirement, S.Rep.No.1775, 81st Cong.2d Sess., 5–6 (1950), notes that it "will vary with the nature of the product" so as to determine an "economically significant" area in which to measure a change in the level of competition. Id., at 5. "In determining the area of effective competition for a given product," the report continues, "it will be necessary to decide what comprises an appreciable segment of the market. An appreciable segment of the market

may not only be a segment which covers an appreciable segment of the trade, but it may also be a segment which is largely segregated from, independent of, or not affected by the trade in that product in other parts of the country." Id., at 6, U.S.Code Congressional Service 1950, pp. 4293, 4297, 4298.

Id. at 556, 86 S.Ct. at 1671.

Clearly, the Government has made no showing that any of the SAMI trading areas are segregated from or independent of trade in other areas. On the contrary, the evidence shows a national uniformity in price, size, quality, ingredient formulation, and marketing techniques throughout the industry. Surely, therefore, each individual trading area is directly affected by the trade in all other areas.

For these reasons, I must conclude that the only relevant "section of the country" in which to measure the effects of this merger on the retail frozen dessert pie market is the United States as a whole.

Earlier in this opinion, I concluded that the Government had failed to define the broad dessert pie product market and the institutional dessert pie submarket since it had offered no data regarding the fresh pie component. Therefore, since the effects of this merger on competition in those markets cannot be accurately measured here, it would serve no purpose to define the corresponding sections of the country. I note for the record, however, that if the government is correct in excluding fresh pies, and limiting the institutional submarket to the frozen variety, the corresponding section of the country would clearly be national. Indeed the plaintiff does not argue otherwise. The sole basis advanced for the existence of any regional geographic markets was the SAMI trading areas system. Everyone agrees that SAMI's projections are limited to retail sales, and have no relationship to the institutional pie business.[14]

13. Cf. *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913 (9th Cir. 1975).

14. My holding that fresh pies must be included in the dessert pie market and the institutional pie submarket might well have an effect on any decision that would deal with geographic submarkets. The evidence shows that unlike fro-

## IV. Effects of the Merger

Having concluded that the only market which the evidence in this case has sufficiently defined is the retail frozen dessert pie submarket for the country as a whole, I turn finally to the ultimate question under Section 7: "whether the effect of the merger 'may be substantially to lessen competition'" in that market. *United States v. Philadelphia National Bank*, supra, 374 U.S. at 362, 83 S.Ct. at 1741. The Government's Post-Trial Memorandum of Law argues at length that the acquisition of Chef Pierre by Consolidated will have anticompetitive effects in both its horizontal and its vertical aspects. Horizontally, it is argued that Consolidated will be eliminated as both an actual and a perceived potential entrant into the market. Vertically, it is said that Consolidated-owned food distributors will be foreclosed as potential customers to other manufacturers. These arguments, however, are addressed principally to the sale of institutional frozen dessert pies, a business which as I have observed does not constitute a relevant line of commerce for the purposes of this case.

The Government's argument with regard to the retail frozen dessert pie submarket is simply that it has made out a *prima facie* case based on market share data.

In 1977, total sales of retail frozen dessert pies in the United States were $144,546,000. This figure consists of the sum of individual sales by the following thirteen producers: [15]

| Company | Sales | Per Cent | |
|---------|-------|----------|---|
| Mrs. Smith's | $59,137,000 | 40.9 | (GX 48) |
| Morton's | 15,814,000 | 10.9 | (Stip. No. 3) |
| Ward | 10,490,000 | 7.3 | (Stip. No. 3) |
| Chef Pierre | 10,248,000 | 7.1 | (Stip. No. 1) |
| Harriss | 9,606,000 | 6.6 | (Stip. No. 3) |
| Banquet | 9,400,000 | 6.5 | (Stip. No. 3) |
| Pet | 7,334,000 | 5.1 | (Stip. No. 3) |
| Fasano | 5,195,000 | 3.6 | (Stip. No. 3) |
| Quality | 5,120,000 | 3.5 | (Stip. No. 3) |
| Edwards | 4,636,000 | 3.2 | (GX 6) |
| Sara Lee | 4,498,000* | 3.1 | (Stip. No. 1) |
| Table Talk | 1,980,000 | 1.4 | (Stip. No. 3) |
| Fields | 1,088,000 | .8 | (Stip. No. 3) |

*Sales for fiscal year ending June 30, 1977.

These figures show that Chef Pierre, as the nation's fourth largest producer, had approximately seven percent of the retail market, and eleventh-ranked Consolidated (Sara Lee) had three percent.[16] If market shares remain constant after the acquisition, Consolidated will control just over 10 percent of the market and will be the third largest producer in the retail frozen dessert pie market.

There is some question whether this figure is sufficient to raise a presumption of unlawfulness under Section 7. In *United States v. Philadelphia National Bank*, supra, the Supreme Court mentioned the estimates of several different commentators as to where "the line of prima facie unlawfulness" should fall. Only one of these was below 10 percent. Two of the other three

---

zen, the fresh pie has a limited shelf life and cannot be transported long distances. Indeed, fresh pie products must be sold within about 200 miles from their place of baking. This could well require a finding of regional markets. On the other hand, the evidence also showed that fresh pies, like their frozen counterparts, are sold on a regular basis by many producers throughout the country. On this record, I simply do not have sufficient evidence to decide whether appropriate analysis of an institutional pie submarket, consisting of both fresh and frozen varieties, would require geographic submarkets.

**15.** These figures appear in my Finding of Fact No. 51 and are reproduced here for convenience.

**16.** Note that this figure may be somewhat misleading. While the figures for the other twelve producers listed above are based on the calendar year 1977, Sara Lee's figures are for fiscal year July 1, 1976 to June 30, 1977. The parties' stipulation No. 1, paragraph 6, incorporated in my Finding of Fact No. 3, shows that Sara Lee's retail sales experienced a steady rate of decline over the years 1974–75 to 1976–77. The uncontroverted testimony of defense witnesses indicated that this trend continued during the latter part of 1977. Therefore, Sara Lee's market share for the 1977 calendar year was probably less than 3.1 percent.

were 20 percent and the third was 24 percent. 374 U.S. at 364, 83 S.Ct. at 1742, n. 41. The Court expressly declined to offer any view as to the validity of these tests. Id. Nevertheless, in *United States v. Von's Grocery Co.,* 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Supreme Court found that the merger of two grocery store chains with a combined market of only 7.5 percent was violative of Section 7.

▆▆ Assuming, therefore, that the Government has established a *prima facie* case of unlawfulness under Section 7, I am then faced with the question of whether defendants have shown "other pertinent factors" affecting their business and their industry which require me to conclude "that no substantial lessening of competition [will occur or is threatened] by the acquisition of [Chef Pierre]." *United States v. General Dynamics Corp.,* 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974). On this record, I find that the defendants have indeed shown such "other pertinent factors" and that this merger will not result in an anticompetitive effect.

In *General Dynamics,* supra, the Government challenged the merger of two companies engaged in the production and sale of coal. The Court found that the combined market share of the defendant companies would be 10 percent and 20 percent in two different geographic markets. This was enough, absent other circumstances, to justify a finding of "undue concentration" and illegality under Section 7. 415 U.S. at 498, 94 S.Ct. at 1194. Nevertheless, the Court affirmed the decision by the District Court to consider other factors which impaired the acquired company's ability to compete effectively in the future.

Competition in the coal industry was marked by an increasing dependence upon utility companies as customers. This

meant, in turn, that producers had to have substantial coal reserves at their disposal in order to attract the utilities' preference for long-term requirements contracts. The available reserves of the acquired company, United Electric, were already committed to such contracts, and could not be used by the company in the competition for new business. This factor "went to the heart of the Government's statistical prima facie case" and supported the District Court's determination that the merger would not have an anticompetitive impact on the market.

There is no reason to conclude that the *General Dynamics* decision should be limited to its facts involving the peculiar exigencies of the coal industry. Rather, the reasoning in this case can provide guidance for a broad range of Section 7 challenges where one party to a merger suffers under an impaired ability to compete. One commentator has suggested, for example, that "[i]f future ability to compete is the keystone, then dwindling product demand or projected technological obsolescence may presage similar market debility." Sloviter, *The October 1973 Term Merger Cases: Whither Clayton § 7?* 48 Temp.L.Q. 861, 881–82 (1975).

*General Dynamics* was followed a year later by *United States v. Citizens and Southern National Bank,* 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). There, the Court explained that once the Government has established a prima facie case of a Section 7 violation, the burden then shifts to the defendant "to show that the market share statistics give an inaccurate account of the acquisitions' probable effects on competition." 422 U.S. at 120, 95 S.Ct. at 2118. The facts of the case were such that due to a long-standing arrangement, the acquiring and acquired companies had not competed in the past, nor where they likely to compete in the future.[17] The Court concluded

**17.** The arrangement among the defendant banks in the *Citizens and Southern* case was called a "correspondent associate program." It was prompted by Georgia state regulations which prohibited banks in cities from expanding into suburban areas. To circumvent this rule, the Citizens and Southern National Bank, located in Atlanta, formed the Citizens and Southern Holding Co. in order to engage in *de facto* branching. The Holding Co. acquired 5% of the stock in a number of suburban banks (the maximum ownership allowed) and much of the remaining stock was held by friendly third parties. The suburban banks were per-

therefore that there would be no lessening of competition. The defendants had thus sustained their burden of proof, and the merger was upheld. 422 U.S. at 121, 95 S.Ct. at 2119.

Also instructive is the Seventh Circuit's decision in *United States v. International Harvester Co.,* 564 F.2d 769 (7th Cir. 1977). There, the court held that after the Government had established a *prima facie* case, showing that an acquisition was presumptively illegal, the District Court was correct in considering evidence of the acquired company's " 'weakness as a competitor.' " 564 F.2d at 773, quoting *United States v. General Dynamics Corp.,* supra, 415 U.S. at 503, 94 S.Ct. at 1197. This evidence concerned the company's serious financial problems before the merger, and its transformation after the acquisition into an independent and aggressive competitor. Beyond a finding that it was proper to consider such factors, the Seventh Circuit read the *Citizens and Southern* and *General Dynamics* decisions as *mandating* an inquiry into this type of information, 564 F.2d at 773.

I am persuaded that mitigating factors of the type discussed above exist in the present case. It is true that Chef Pierre controls seven percent of the retail frozen dessert pie market, and that Sara Lee may have about three percent, providing for an approximate 10 percent combined market share. Furthermore, as part of its *prima facie* case, the Government points to the level of concentration in the industry. After the merger, Consolidated would be the third largest producer in the market, behind Mrs. Smith's and Morton. Together, these three would control approximately 62% of the retail market.

These figures, however, do not provide an accurate picture of the defendant companies or the market in which they compete. The most important factors to be considered are the weakness of Sara Lee and the strength of Mrs. Smith. The evidence

shows that Sara Lee has experienced a steady and precipitous rate of decline in retail frozen pie sales over the past several years. Measured by dollar volume the company's sales reached their high point at $7,535,600 in 1974–75. At the end of fiscal year 1976–77, this figure had fallen to $4,525,100. Similarly, case sales dropped from their 1973–74 high of 1,179,300 to 649,600 in 1976–77. Furthermore, it was testified that the company was forced to eliminate several varieties of pie due to poor sales results. Distribution of Sara Lee pies has become very "spotty." Some outlets have discontinued Sara Lee pies altogether, while others will carry only one or two varieties, such as apple, and possibly pumpkin in season.

In testimony unchallenged by the Government, the president of Sara Lee attributed his company's lack of success in the retail pie market to its inability to match other manufacturers in either quality or price. Sara Lee has had to sell its pies for 50 to 60 cents more than, for example, Mrs. Smith's, without being able to offer the consumer a corresponding quality advantage. Sara Lee's lack of success in the retail business, and the company's persistent inability to solve the problem, has caused it to refrain from entering the institutional pie trade.

Further compounding the problem is Sara Lee's heavy reliance on pumpkin pie sales. The parties' Stipulation No. 1 shows that pumpkin pie constituted 32 percent of the company's 1976–77 dollar sales, and 37 percent of its unit (case) sales, unusually high figures in the retail pie industry.[18] The highly seasonal nature of pumpkin pie makes it undesirable to depend upon this product for sales volume. This is particularly so in light of the fact that, unlike other pie products, pumpkin pies are sold by Sara Lee on a "guarantee basis," i. e., that the company must take back from the warehouses those pies not sold by January 1.

mitted to use C & S's logogram, as well as its banking services, and C & S exercised a close operational oversight. The expectation of all concerned was that C & S would acquire the

suburban banks as soon as state law or a change in Atlanta city limits permitted.

18. See note 11, supra.

The above evidence leads me to conclude that Sara Lee's competitive position is one of weakness rather than strength. It seems clear that no anticompetitive advantage will accrue to Chef Pierre as a result of this merger, and the Government makes no argument to the contrary. As to Consolidated, it is quite possible that the acquisition of Chef's expertise will permit Sara Lee to solve the technological problems which have plagued it for so long, thereby enabling the company to market a truly competitive pie for the first time. The likely result of the merger, therefore, would be an increase, rather than a lessening of competition.[19]

Other factors concerning the companies and the retail frozen pie industry must also be considered. Without challenge by the Government, the defendants offered evidence to show that Consolidated would operate Chef Pierre and Sara Lee as wholly separate *and competing* companies. It was testified that Chef would be made part of a grocery and confections "group" of which Sara Lee is not a part. Since the Government did not seek to contradict the assertion that Chef and Sara Lee would continue to compete, it seems somewhat illusory to speak of their "combined market share." It is also worth noting that while Chef Pierre is certainly a healthy competitor, its true strength lies in the institutional rather than the retail side of the pie business. Sara Lee, by contrast, produces virtually no institutional pies at all. To a large extent the merger is of complementary, not competing companies. See *United States v. General Dynamics Corporation,* 341 F.Supp. 534, 558–59 (N.D.Ill.1972) aff'd, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

Moreover, to the extent that there is concentration in the retail frozen dessert pie market, it is due primarily to the lion's share being controlled by the Mrs. Smith's Pie Company. As the industry leader, Mrs. Smith's had approximately 41 percent of the market in 1977 with a thunderous $59,137,000 in sales. The second largest producer was Morton's with 11 percent of the market, and sales of $15,814,000. Of the remaining 11 producers, nine are rather evenly distributed between a low of 4.5 million dollars and a high of 10.5 million dollars. The two smallest companies had 1 and 2 million dollars in sales, respectively. If market shares remain constant after the merger, the Chef Pierre-Sara Lee combination will have sales of 10 percent, still less than one-fourth of Mrs. Smith's. In toto, the premerger picture is one of an industry giant with 41 percent of the market, five competitors with 38 percent, and the remaining seven sharing 21 percent. The post merger picture will be practically the same: an industry giant with 41 percent of the market, five competitors whose sales will then equal that of the leader, and the remaining six dividing 18 percent among them.

In addition to the weakness of Sara Lee and the strength of Mrs. Smith's, another factor to be considered is the diversified nature of the retail frozen pie market. In *United States v. Aluminum Company of America,* supra, the Court, faced with a highly concentrated market and a diminishing number of competitors, ruled that even a slight increase in the market share of a dominant company was likely to produce a substantial lessening of competition. The opposite factors are present here: Chef Pierre and Sara Lee are not market leaders;

**19.** It should be noted that the defendants did not at any time raise the "failing company" defense announced by the Supreme Court in *International Shoe Co. v. F.T.C.,* 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed.2d 431 (1929), and I place no reliance on that theory in reaching my conclusion here. Indeed, it is clear that defendants could not satisfy the requirements for invoking the failing company doctrine expressed in *United States v. Greater Buffalo Press, Inc.,* 402 U.S. 549, 555, 91 S.Ct. 1692, 1696, 29 L.Ed.2d 170, and *Citizen Publishing Co. v. United States,* 394 U.S. 131, 138, 89 S.Ct. 927, 931, 22 L.Ed.2d 148. Rather, the defendants argue, and I agree, that technological difficulties and limited product variety have caused Sara Lee's sales to decline in recent years and impaired its ability to compete in the future. The distinction between this argument and the failing company defense is discussed by the Supreme Court in *United States v. General Dynamics Corp.,* supra, 415 U.S. at 506–08, 94 S.Ct. at 1198–99.

Mrs. Smith's is. Moreover, the market in all its phases is expanding, not contracting. The evidence showed that a new competitor, Heinz, had recently entered the field, while existing manufacturers are expanding their product lines and their geographic areas of sales.

Still another consideration is the absence of entry barriers to the frozen pie business. The evidence showed that there are no legal, physical, economic, or geographic factors to keep potential competitors out of the market. There are no patent or trade secrets [20] which preclude competition. Product differentiation and brand loyalties, established through extensive advertising campaigns, are not particularly important considerations. A well organized distributional system, presently existing for other food products, is available for the new entrant. Transportation costs are relatively small—and frozen pies produced anywhere in the United States can also be sold anywhere. Capital requirements are minimal and used as well as new pie making equipment can readily be purchased.

Another significant characteristic of the retail frozen dessert pie industry must also be considered. Of the eleven major retail producers other than Sara Lee and Chef Pierre, at least six are owned by larger companies. Mrs. Smith's is owned by Kellogg's,[21] Morton by ITT, Pet Ritz by Pet Inc., Banquet by RCA, Mountain Top by Quality Baking Co., and Johnsons and Simple Simon by Ward Foods, Inc. This does not show a trend towards concentration in the industry, since most of the parent companies are conglomerates not otherwise manufacturing pies. There was no evidence that any of these acquisitions reduced the number of competitors in the industry. What this does show is that the Consolidated-Chef Pierre merger will not put a giant in competition with a field of midgets.

For all these reasons, therefore, I conclude that the acquisition of Chef Pierre by Consolidated Foods is not likely to have an anticompetitive effect on the retail frozen dessert pie market in the United States.

As noted earlier, the plaintiff also raises several arguments regarding the purported institutional frozen dessert pie submarkets. Having decided that this line of commerce also includes fresh pies, however, it is impossible to measure the anticompetitive effect of the merger without a more complete market definition. Nevertheless, if the Government was correct in excluding fresh pies, I would have to conclude in any event that the effect of the merger on the more restricted frozen institutional market would not be substantially to lessen competition.

First, the Government argues that as a result of the merger, Consolidated will be removed as an *actual* potential entrant into the institutional frozen pie market, either by *de novo* entry or through a foothold acquisition. Whether a merger can be prohibited on the basis of this theory is a question that the Supreme Court has twice expressly declined to resolve. *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973).

In *Marine Banc*, the Court stated that two "essential preconditions" had to exist before it could decide whether the actual potential competition theory was viable as the basis for a Government Section 7 suit:

(1) that in fact the acquiring firm has "available feasible means" for entering the target market other than by the proposed acquisition;

---

20. Technology, a superior product, and an organization with the ability to provide service, are, of course, important as Sara Lee's problems demonstrate. However, these requirements are not entry barriers, but in the frozen pie business, at least, the signs of a healthy, highly competitive market where small producers and efficient, large producers make survival for the marginally skilled producer doubtful and difficult.

21. Mrs. Smith's, in turn, has owned the Lloyd J. Harriss companies for several years, and is now in the process of divesting Harriss pursuant to the order of Judge Newcomer in *United States v. Mrs. Smith's Pie Co.*, 440 F.Supp. 220 (E.D.Pa.1976). See note 25 infra.

(2) "that those means offer a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." 418 U.S. at 633, 94 S.Ct. at 2875.

Clearly, these conditions have not been met in the present case. Far from proving that Consolidated has "available feasible means" for entering the institutional market, the evidence shows quite the opposite. Sara Lee has had a notable lack of success in the retail market because of its technical inability to produce a pie of competitive quality and price. Moreover, in testimony that went completely unchallenged by the Government, the defense showed that Sara Lee actually made two previous attempts at de novo entry into the institutional market and did not succeed on either occasion. The company's failure the first time was caused by "lack of an appropriate sales rate and lack of profitability." [22] On the second effort, the company was frustrated by a technical problem that it was never able to resolve.[23]

It is apparent, therefore, that Consolidated does not have an "available feasible means" for entering the institutional market de novo, since it obviously lacks the technical expertise needed for success in that market. Its notable lack of success in the retail market, and its failures in two prior attempts at selling in the institutional trade convince me that Consolidated is thoroughly discouraged from becoming a de novo entrant into the institutional market, and that it could not feasibly make such an entry. The Government has demonstrated nothing to the contrary.

Therefore, since the first of the Supreme Court's "essential preconditions" has not been met, I need not even reach the question left open in Marine Banc and Falstaff, supra, whether the actual potential competition theory can provide the basis for a Section 7 suit.

The Government's second theory is that the challenged merger will eliminate Con-solidated Foods as a perceived potential entrant into the institutional market. This argument, like the first, is readily disposed of by reference to the Marine Banc decision. There the Court explained the requirements for application of the "perceived potential entrant" theory:

> [T]he Court has recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential de novo entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market.

418 U.S. at 624–25, 94 S.Ct. at 2871. The Court then went on to explain the close interrelationship between the actual and perceived potential competition theories. The Government in Marine Banc had failed to show that the acquiring firm was likely to enter the target market de novo, primarily because of state regulatory barriers. Thus, it was not an actual potential entrant. "It must be assumed" said the court, "that rational competitors in the target market are aware of these barriers, and thus, they do not see the acquiring firm as a competitive threat. It was not, therefore, a perceived potential entrant." 418 U.S. at 639, 94 S.Ct. at 2878.

The situation here is similar. Consolidated is not an actual potential entrant because of technological barriers and a past history of economic failure. I do not have to assume that rational competitors in the institutional market are aware of Consolidated's problems, because uncontroverted testimony established this awareness. It is quite clear that no one perceives Consolidated as a potential entrant into the institutional frozen market.

■ I should add a note here regarding the Supreme Court's further requirement that the "acquiring firm's premerger pres-

---

**22.** Tr. 7–152.

**23.** Specifically, the company experienced a "crust problem." Tr. 7–165.

ence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market." This is wholly unestablished as well. First, there is no evidence of oligopolistic behavior in the institutional market. On the contrary, all the parties agreed that the level of profitability in this industry was rather low, and this is normally indicative of competitive, rather than oligopolistic practices. Secondly, the Government did not show that any competitor changed or tempered its conduct as a result of seeing Consolidated "standing in the wings." Absent such a showing, the Government cannot succeed on a theory of perceived potential competition. See *United States v. Marine Bancorporation, Inc.*, supra, 418 U.S. at 639–40, 94 S.Ct. at 2878–79.

The Government's third argument is that the merger in this case will "entrench" Chef Pierre's leading position in the institutional frozen dessert pie market. There are figures to indicate that Chef leads the institutional field with $25,885,000 in sales and a 1977 market share of 39.3 percent.[24] Considering Sara Lee's obvious lack of expertise in this market, however, it is difficult to see what "entrenching" effect the merger may have. Certainly Chef has nothing to gain from Sara Lee in the way of technical knowledge, and the Government makes no argument to the contrary. The Government does argue, however, that Sara Lee's broad range of experience at marketing consumer products will be devastating when combined with Chef Pierre's dominance in the institutional pie market. Whatever successes Sara Lee may have enjoyed in selling other products, its record in marketing pies has been anything but devastating, except perhaps to Sara Lee. The combination of Consolidated's marketing techniques with Chef Pierre's pies, therefore, does not pose an anticompetitive threat to the institutional market.

Of course, it cannot be denied that if nothing else, Chef Pierre will certainly gain the advantage of access to the considerable financial resources of Consolidated Foods.

This, however, does not justify a finding that the merger is anticompetitive on entrenchment grounds. One commentator has noted a reluctance to apply the entrenchment doctrine where the only advantage to the acquired firm is financial "because it would resemble a frontal attack on size." Sloviter, supra, 48 Temp.L.Q. at 890. Indeed, the Second Circuit has stated that "the 'entrenchment' theory seems to require more than simply a showing that the acquiring firm has a deep pocket." *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 865, cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

The *Missouri Portland* panel went on to point out that the entrenchment problem which concerned the Supreme Court in the leading case of *F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), was not a matter of size or raw financial clout. Rather, a unique competitive advantage accrued to the acquired firm because its product, bleach, was complementary to many of the kitchen items produced by the acquiring firm. The potential for advertising and marketing combinations was thus overwhelming.

No such potential competitive advantage has been shown by the Government in this case. I find, therefore, that no serious threat of entrenchment is presented.

The Government's fourth and final argument regarding the institutional market brings us from the horizontal to the vertical aspect of the merger. Here, the plaintiff points out that Consolidated Foods owns several food service distributors, through which manufacturers sell their frozen dessert pies. Specifically, these Consolidated distributors are Monarch/PYA, Harrison House, and Booth Fisheries.

The Government argues that if the merger is consummated, these distributors would be foreclosed as customers to the competitors of Chef Pierre because Consolidated would require them to deal exclusively in Chef pies. This, I am told, would be seriously anticompetitive because one of these

---

**24.** Finding of Fact No. 52 notes a conflict in the evidence on this point.

distributors, Monarch/PYA, is among the largest in the nation.

■ I cannot agree with the Government's position. In the words of the Supreme Court, "it is to be remembered that § 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *United States v. Marine Bancorporation, Inc.,* supra, 418 U.S. at 622-23, 94 S.Ct. at 2870, quoting *Brown Shoe Co. v. United States,* 370 U.S. at 323, 82 S.Ct. at 1522-23. The only evidence offered to support the Government's theory was testimony from two employees of a food service broker. They stated their understanding that Monarch/PYA had stopped buying Mrs. Smith's Pies as of the announcement that Consolidated would acquire Chef Pierre.

However damning this testimony might seem, its content was specifically denied by the Monarch/PYA employee who had been identified as the source of this information. On the contrary, it was his understanding that all divisions of Consolidated Foods were to operate on an "arm's length" basis, and that Monarch/PYA would always be free to handle the pies of Chef's competitors. This was corroborated by Sara Lee's president, who similarly testified that all Consolidated divisions were to operate at "arm's length."

■ At best, this presents a stand-off in the direct evidence. Based upon other evidence, I conclude that contrary to the Government's predictions, there is no substantial danger here of vertical foreclosure. First, at the present time Consolidated's brokers buy products, including pies, from Mrs. Smith's, which compete with Sara Lee. Second, as we have previously seen, Consolidated intends to operate Chef Pierre as a separate and distinct company from Sara Lee and its other food divisions. This supports the inference that Consolidated has a policy of requiring its divisions to operate

at "arm's length" and in competition with one another. Third, this appears to be a common practice in the industry. Indeed, the Government's own witness indicated that Mrs. Smith's various divisions are made to compete with one another toe-to-toe. Fourth, even if Consolidated's distributors are foreclosed to other competitors, the Government has not shown that any anticompetitive impact will occur. The evidence discloses that there are some 2,400 distributors in the United States. Even Mrs. Smith's, the largest of all the frozen pie manufacturers, only uses about 1,000 of them. There has been no showing, therefore, that Chef's competitors will have any difficulty in finding a market for their pies if they are foreclosed to the Consolidated distributors.

Thus, I hold that even if the Government was correct in limiting the institutional pie submarket to frozen dessert pies, the merger would not have an anticompetitive effect in that line of commerce.

## V. *Conclusion*

For all the reasons expressed at length herein, I conclude that the only relevant product market properly defined by the Government in this case is the retail frozen dessert pie submarket; that two other lines of commerce also exist, those being the dessert pie market, and the institutional dessert pie submarket; that these latter markets have not been thoroughly defined, thereby preventing an accurate assessment of the merger's effect upon them; that the only appropriate section of the country in which to judge the effects of this merger is the United States as a whole; and finally, that the acquisition of Chef Pierre, Inc., by Consolidated Foods Corp. will not have the effect of substantially lessening competition in any line of commerce in any section of the country.[25]

---

25. I am aware of the decision by my learned colleague, Judge Newcomer, in *United States v. Mrs. Smith's Pie Co.* 440 F.Supp. 220 (E.D.Pa. 1976). I recognize that several of the conclusions expressed in that opinion are inconsistent with some of the holdings that I have reached herein, particularly with regard to the relevant product market. This, however, does not mean that I consider the *Mrs. Smith's* findings to be erroneous. While the same industry is involved in both cases, the evidence presented before Judge Newcomer may have differed sub-

Walter L. Devany, John J. Hughes, James A. Backstrom, Jr., Raymond D. Cauley, Jr., Norma B. Carter, R. J. Scott Griffith, Antitrust Div., Philadelphia, Pa., for plaintiff.

Louis C. Keiler, Earl E. Pollock, Gary Senner, and Sharon S. Feather, of Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Consolidated Foods.

---

stantially from that contained in the instant record, upon which, of course, I base my conclusions.